T. H. Reiter, Appellant, v. Illinois National Casualty Company et al., Appellees.

Gen. No. 43,492.

236

Opinion filed March 11, 1946. Rehearing denied March 25, 1946. Released for publication March 25, 1946.

JOHN A. BROWN, of Chicago, for appellant.

PAUL H. HEINEKE, of Chicago, for certain appellee.

WALTER T. DAY, for certain other appellees.

GEORGE F. BARRETT, Attorney General, and JOHN D. BLACK, of Chicago, for certain appellee; WILLIAM C. WINES, Assistant Attorney General and WINSTON, STRAWN & SHAW, of Chicago, of counsel.

DENT, WEICHELT & HAMPTON, of Chicago, for certain other appellee.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

Plaintiff brought suit for an accounting and for the return to him of certain stock of the Illinois National Casualty Co. (hereafter called the Casualty company) which he claimed was obtained from him by duress and coercion by the defendants Barr, vice president and principal minority stockholder of the Casualty company, Fitzgerald, the personal attorney for Barr and later attorney for Barr as "conservator" of the Casualty company, and Palmer, superintendent of insurance. The Casualty company, and Fidelity Deposit Company of Maryland, surety on Palmer's official bond, were also made defendants. At the close of plaintiff's evidence before the master to whom the cause had been referred, each defendant moved for a finding in his behalf and for a report recommending the dismissal of the amended complaint for want of equity. The master reported, making certain findings of fact and recommending the dismissal of the complaint. The trial court, overruling plaintiff's exceptions, approved the master's report and entered a decree dismissing the complaint. Plaintiff appeals.

Defendants' motions had the effect of submitting the cause on plaintiff's evidence alone. *Kanauske v. Clark*, 388 Ill. 357. This evidence shows: Reiter, the plaintiff, had been engaged in the insurance business in Chicago since 1911, first in the general brokerage agency business, and from about 1918 to August 1930 as manager of the Reciprocal Insurance Exchange, which was converted into an Illinois corporation (Illinois National Casualty Co.) with a capital stock of $200,000—4,000 shares of a par value of $50, and a surplus of $40,000. Plaintiff owned approximately 75 per cent of the capital stock and was the president of the company. It started in business August 1, 1930. Within a short time the U. & I. Service Company, an Illinois corporation with a capital stock of $5,000, was organized to act as general agent of the Casualty company and other lines of insurance.

Plaintiff owned and controlled this company. O. E. Winzer, a certified public accountant specializing in the auditing of insurance companies, was the auditor and financial advisor of plaintiff's companies from 1921 to 1933. The Casualty company and the U. & I. Service Company were formed at his suggestion and under his direction. In 1931 defendant Barr owned the controlling stock of the Eastern Underwriters Corporation of Springfield, Ill., and was in charge of the business of that company. It was attorney in fact for the Eastern Automobile Insurance Underwriters, a reciprocal exchange similar to that operated by plaintiff before the organization of the Casualty company. Winzer was the auditor of the Barr companies. In early March 1931 he suggested the merger of plaintiff's companies and the Barr companies. Following conferences between plaintiff, Barr and Winzer it was agreed that the companies be merged and that a holding company be organized for that purpose; that the stock of this company be divided 55 per cent to plaintiff and approximately 40 per cent to Barr—the exact amount to be determined later by Winzer after the acquisition of all the stock in the Barr companies, and the remaining 5 per cent to Winzer, who was to attend to all details of the merger, the organization of the holding company, liquidation of the Eastern Underwriters Corporation, etc. The Finance and Investment Company was organized as a holding company with a capital stock of 40,000 shares, no par value. The par value of the Casualty company stock was changed to $10 per share and the number of shares increased to 20,000. In March 1931 the Casualty company took over all assets of the Eastern Automobile Insurance Underwriters and assumed all its risks, liabilities, etc. This merger was approved by the insurance department of the State. Barr owned 130 shares of the capital stock of the Eastern Underwriters Corporation. Other persons owned the remaining 120

shares. All this stock was exchanged for stock in the Casualty company at the rate of 15 shares of the latter company for one of the former. To effect this change plaintiff delivered to Winzer 4,000 shares of his stock in the Casualty company. Nineteen hundred fifty of these shares were turned over to Barr for his stock, and 1,800 shares were delivered to the remaining stock holders of the Eastern Underwriters for their stock. The stock thus acquired was turned over to the holding company. In April 1931, following the absorption of the Eastern Automobile Underwriters by the Casualty company, the latter company entered into a verbal agreement with the Equitable Adjustment Company of Chicago, a corporation, the capital stock of which was owned by the holding company, whereby the Adjustment company was to handle all loss adjustments of the Casualty company for 7 per cent of the net premiums received by the latter company. As a part of the merger it was agreed that each of the parties was to transfer to the holding company his shares of stock in the companies involved and that the holding company was to assume loans which plaintiff had obtained from the Lake Shore Trust & Savings Bank and the Cosmopolitan State Bank, both of Chicago, and with Baker Walsh & Co., an investment brokerage company of Chicago, totaling about $70,000. Blocks of plaintiff's stock in the Casualty company totaling 5,050 shares had been deposited with each of the Chicago banks as collateral to secure the respective loans at the bank. Pending completion of the merger and full operation thereunder, plaintiff was to continue payment on these obligations and was to be reimbursed by the holding company for such payments. In May 1933 the books of the holding company showed a credit to plaintiff of approximately $25,000, representing amounts paid by plaintiff on the loans. Plaintiff remained as president of the Casualty company, managing the Chicago office and in full charge of the entire organization of the

affiliates and the holding company. Barr became vice president, managing the Springfield office and in charge of the field and sales agency end of the business. Winzer had a man on the board of directors and was to look after all the investments and advise and counsel relative to the securities and take charge of the auditing and of the financial reports and statements. The business was conducted in apparent harmony until the fall of 1932 when Barr employed Fitzgerald as his personal attorney and began a controversy with plaintiff regarding the conduct of the business of the Casualty company and the completion of the merger.

In December 1932 the Insurance Department commenced an examination of the Casualty company for the period from December 1, 1930 to and including November 30, 1932. This examination was under the direction of Neil Russell of the department. He reported to the defendant Palmer, as acting Director of Trade and Commerce and Superintendent of Insurance, under date of February 23, 1933. He found that the Casualty company settled its just claims promptly and equitably, but that it had paid the Adjustment company $17,465.50 in excess of the amount due under its agreement with the Casualty company; that the loss ratio of the company was normal, its administrative expenses excessive, and that its surplus of $15,795.31 over liabilities appeared small. No other major objections to the condition of the company or its method of doing business were noted.

On March 1, 1933 the Casualty company filed in the insurance department at Springfield its annual report for the year 1932. This report was prepared by Winzer and signed in blank by plaintiff and the secretary of the company C. L. Morris. It showed, among the securities held by the Casualty company, $15,000 par value Liberty bonds. May 8, 1933, Russell appeared at the office of the Casualty company in Chicago and asked plaintiff to show him the Liberty bonds shown

in the report. Plaintiff replied that the company had no Liberty bonds and that Russell knew it; that he had checked the securities of the company with plaintiff in January and didn't find any Liberty bonds; that the company did not have any. The next day plaintiff received notice to appear at the offices of the insurance department in Springfield on May 10. He appeared with his attorney, Mr. Albert Hassell. He there met Barr and his attorney, Fitzgerald, and Morris, the secretary of the company. Fitzgerald introduced them to Palmer, who in turn introduced them to Nelson and Conover of the insurance department, stating that Nelson and Conover would conduct the hearing or examination. Palmer took no part in the meeting which followed. Barr, Fitzgerald, Morris, plaintiff and Hassell, and Nelson and Conover from the department, were present. In answer to inquiries by Conover plaintiff stated that the annual report had been prepared by Winzer and sent to the department by him, and that he, plaintiff, had signed the report in blank; that the company had never had any Liberty bonds; that he did not know that Liberty bonds were shown in the report. Conover then asked if plaintiff did not know that filing a false statement was a criminal offense; that he, plaintiff, was subject to a criminal prosecution and could be sent to the penitentiary. He replied that he did not. Someone said plaintiff should be taken to the government and prosecuted for sending the report through the mail. Fitzgerald talked about poor management of the business and plaintiff being short in his accounts, but when asked by plaintiff as to what shortages, said he did not know. There was also discussion about some Wisconsin mortgages. Conover, Fitzgerald and Nelson stepped out of the room, saying they would have to talk with Palmer. They returned with a letter signed in Palmer's name addressed to the Casualty company directing that the executive officers of the company appear at the office of the department

on May 12 with a definite plan in writing for the reorganization and rehabilitation of the affairs of the company; that the plan presented include an immediate advance of not less than $100,000 in cash or government securities to the surplus of the company, otherwise it would be necessary for the department to cancel the company's authority to transact business in the State of Illinois; that Winzer be present on May 12, with a certified copy of his audit of the company as of December 31, 1932; that no disposition be made of any assets of the company except in the settlement of legitimate losses upon approval of all executive officers of the company. After the meeting, plaintiff, Hassell, Fitzgerald, Barr and Morris went to the hotel room plaintiff and Hassell were occupying, where plaintiff laid down on the bed seemingly exhausted and completely at a loss what to do. Fitzgerald told him not to take it too hard, that ''I know Ernie over there pretty well and I will see if we can work out some kind of a job for you up there in Chicago.''

Plaintiff and Hassell returned to Chicago, held a conference on May 11 and returned with Winzer to Springfield on May 12 when another meeting was held in the office of the insurance department. Barr, Fitzgerald, Conover, Nelson, Russell, Morris, plaintiff, Hassell, Winzer, and Kadyk, an assistant attorney general, were present. Nelson and Kadyk took charge of the meeting. Winzer was questioned about the Liberty bonds shown in the annual statement, and about Wisconsin mortgages. Plaintiff said he had not brought down the $100,000 in Liberty bonds or money. Nelson then said, ''We will have to divest you of the management of the company and Mr. Palmer will have to take it over and appoint a conservator''; that there is a bill in the legislature that is just being enacted, which the governor would sign on the following day, which gives Mr. Palmer the authority to appoint a conservator—''We have delegated that Mr. Barr should

be appointed. . . . We will expect you to do everything that the Department requests of you and to turn over everything to the Department. There is nothing should be said, what transpired in this meeting, to anyone. If you do, you are subject to criminal prosecution and a penitentiary sentence.'' Under date of May 13, 1933 Palmer issued an order under his official seal, reciting that by direction and with approval of the governor of the State and pursuant to an Act approved ·May 11, 1933, and in order to conserve the income and assets of the Casualty company for the benefit of its policyholders, creditors and the public generally, he, Palmer, Superintendent of Insurance, adopts and promulgates the following rules and regulations which he deems necessary for the purpose of carrying out the provisions of said law: (1) Pending final settlement of the affairs of the company, Barr is appointed conservator for a period of 30 days or until removed by Palmer, with power to direct the affairs of the company in their entirety, provided, however, that no action shall be taken by him without first consulting Palmer, and then only with Palmer's approval; (2) All securities, investments, bonds, mortgages, etc., now included in the assets of the company shall be immediately deposited with the Superintendent of Insurance for safe keeping; (3) No securities, mortgages, moneys or anything of value included in the assets of the Casualty company shall be disposed of, nor shall there be any substitution of any securities, mortgages, or other assets of the company without Palmer's approval; (4) No salaries or moneys shall be paid officers or employes of the company without Palmer's approval; (5) New business and renewals of old business may be written or rewritten, provided premiums received from policyholders on policies in force on or after the date of this order shall be set aside without deduction for the payment of commissions, brokerage, etc., in a special fund and invested only in federal government

securities or bonds of the State of Illinois, so that they will be available for return to the policyholder paying the same in the event it is necessary to place the company in liquidation; (6) Before assuming the powers and duties hereby authorized, Barr shall furnish a bond in a duly authorized company in the amount of $50,000 for the faithful accounting of securities and moneys coming into his possession; (7) This order may be modified or terminated in whole or in part at any time upon Palmer's order. The order was approved by the governor and extended from time to time to and including September 12, 1933 by indorsements signed by Palmer and the governor. Barr gave bond, with defendant Fidelity and Deposit Company as surety, running to ''Ernest Palmer, Superintendent of Insurance,'' the bond to be void if Barr ''shall faithfully account for all securities and moneys coming into his possession as Conservator of the Illinois National Casualty Company.'' Fitzgerald became attorney for the conservator.

On May 13 Barr arrived at the Chicago office of the Casualty company to take charge under the authority granted by Palmer as Superintendent of Insurance. Plaintiff was at the office but in extremely poor physical condition. He rested on the couch for several hours before being able to go with Barr to the vaults of the Lake Shore Trust & Savings Bank to turn over to Barr the securities of the company. In speaking to Lane, a stockholder and employee of the company, regarding plaintiff's condition, Barr laughed and said, ''The old man has passed out.'' He then told Lane that the department (meaning the insurance department) had turned over the company to him, Barr, and that plaintiff wasn't in the picture any more; that he was in the back room and that Lane couldn't go in to see him because he was not in any fit condition for anybody to see.

Shortly after Barr took possession of the company assets and business, Russell was sent by the department of insurance to make an examination covering the period from November 30, 1932 to and including April 30, 1933. The report of this examination dated June 15, 1935, shows an impairment of the capital of $222,998.40, and a surplus (deficit) as regards policyholders of "—$22,998.40." The assets of the company not approved by the auditor totaled $300,914.16, the principal items being: Excess value of Wisconsin loans—mortgages on cut-over timber land, $57,250; Excess value of the Carmen loan, mortgage on farm lands in Christian county, Illinois, $10,500; Mortgages not accounted for, being four mortgages on land in Forrest county, Wisconsin, $30,000; Book value of bonds over market value, $95,830.13; Book value of bonds (U. S.) not accounted for, $15,750; Premiums in course of collection over 90 days old, $53,186.43; Due from the U. & I. Service Corporation and Eastern Underwriters Corporation, $25,914.66. In his conclusion in the report Russell stated that the plight of the company was due to close affiliations with the subsidiary companies. He recommended refinancing of the company as the most desirable solution, stating that there was a possibility of getting the stock pledged with the Chicago Banks (being the 10,100 shares of stock pledged by plaintiff) and selling this to replace part of the worthless assets; that it would be necessary to secure $100,000 to $125,000. The next best solution according to Russell, was a consolidation. The report showed liabilities over assets, exclusive of stock liability, $38,177.31, but the report said the Casualty company had two valuable assets—a well developed agency plant, and a substantial volume of good business written; that the value of these assets depends "entirely upon the continued association of C. H. Barr and C. L. Morris with the company assuming the business." Re-

insurance was not recommended and liquidation ''under the conditions here'' was deemed to have no merit.

About June 6, 1933 plaintiff went to the Lake Shore bank and found Fitzgerald at the desk of Fry, the president, and was told by Fry that Fitzgerald was trying to make arrangements to pick up plaintiff's stock but that Fry was going to protect plaintiff to any length he could. June 7, 1933 plaintiff made a payment of $300 on his loan which was due June 20, 1933. June 10, 1933, Barr, as conservator of the Casualty company and secretary treasurer of the holding company, advised the Lake Shore Trust & Savings Bank and the receiver of the Cosmopolitan State Bank by letter that the respective blocks of stock of the Casualty company held as collateral to the personal loans of plaintiff were the property of the holding company and should not be released without notice to Barr, who had been appointed conservator of the Casualty company and its affiliated corporations, including the holding company, by written order of the Governor and the Superintendent of Insurance of the State of Illinois; that on May 12, 1933, at a hearing before the insurance department and the attorney general of the State of Illinois, plaintiff had agreed to surrender to the insurance department all stocks, assets, records and everything whatsoever pertaining to the Casualty company and its affiliated corporations; that if the banks did not desire to longer carry the loans and would advise Barr, he would endeavor to obtain authority from the superintendent of the department of insurance to pay off the obligations so that the note and the stock, which is collateral, might be delivered to him, Barr. Under date of June 9, 1933 plaintiff was directed by letter from Palmer as Superintendent of Insurance to appear at the Chicago office of the department on Monday, June 12, for a hearing to be conducted by Mr. Hiram McCullough. Plaintiff appearing with his attorney, Hassell, was asked where his shares in the Casualty company and its affiliates were. Plaintiff

said he had 5,050 shares of the Casualty company up at one bank as collateral and 5,050 shares at another bank as collateral and that he had some shares at home, and 22,000 shares of the Finance & Investment Company at home. McCullough ordered him to turn in those shares of stock. Plaintiff protested and McCullough replied, "Well, that is the orders." He also said, "Well, here is the instructions from the boss," and handed plaintiff and Hassell a slip of paper showing the various stock certificate numbers and the number of shares and also a typewritten form of assignment, and said, "You know you are subject to going to the penitentiary here on account (of) signing a false report, and your shortages." Plaintiff asked what shortages, and McCullough replied, "Well, I don't know, but there are shortages about $89,000," and he said, "Either you are to do this or else," and told them to follow the slips for the way to write up the assignments and sign the stock certificates. Following this demand plaintiff indorsed certificates of stock in the Casualty company for a total of 805 shares, and certificates for a total of 22,000 shares in the Finance & Investment Company to Palmer as Superintendent of Insurance and acting Director of Trade and Commerce, and executed assignments in the form given plaintiff by McCullough of the stock of the Casualty company pledged with the Cosmopolitan State Bank and the Lake Shore Trust & Savings Bank to secure plaintiff's loans. These stock certificates and assignments were forwarded to Palmer with a letter from Hassell dated June 12, 1933, directed to Palmer as Director of Trade and Commerce. No further payments having been made on plaintiff's loan with the Lake Shore bank, 5,050 shares of the capital stock of the Casualty company were sold June 23, 1933 at private sale to the defendant Fitzgerald for $2,500.

By letter of June 26, 1933 from Palmer as Superintendent of Insurance, plaintiff was directed to appear at the office of the department on June 28 for the pur-

pose of discussing certain matters pertaining to the Casualty company and its subsidiary organizations, which "must be settled prior to July 1st." Plaintiff appeared with Hassell. Barr, Fitzgerald and Winzer were also present, as was Nelson of the department and Kadyk of the attorney general's office. The meeting was held in the anteroom of the Supreme Court in the Supreme Court building. Nelson took charge of the meeting and said that it had been called for the purpose of doing something definite before July 1, when the franchise taxes of all the corporations were due; that they wanted to get them in one corporation and see if they could not dissolve the holding company and the affiliated companies (Eastern Underwriters Corporation, U. & I. Service Corporation and Equitable Adjustment Company), and throw all of the assets and liabilities into the Casualty company; that plaintiff would have to release his credit on the books of the holding company of approximately $25,000. Plaintiff protested that he had the money coming; that approximately 4,000 shares of his holdings in the Casualty company were used to acquire the Eastern Underwriters Corporation stock, which Barr was to turn in; that he had paid the moneys at the bank in accordance with the directions and instructions of Winzer, who had handled the whole matter; that it was understood the holding company was to take over these obligations. Nelson said that the obligation of the holding company had to be released; that if they did not go through with the deal they (the department) would have to throw the company into receivership; that plaintiff had made a false statement to the department, and had shortages; "I am running this show"; "You have got to do as we want you to do." Fitzgerald said that plaintiff had not fulfilled his contract and had nothing coming; that the books showed plaintiff was $80,000 short in his accounts and it was an outrage that the $25,000 should stand in the way of getting

everything into the Illinois National (the Casualty company) and reorganizing the company. After the meeting had been in session about an hour and seemed to be at a standstill, Hassell took plaintiff into the Supreme Court room, where they talked about ten minutes. On returning to the conference Hassell said that he had proposed to plaintiff that he turn over everything he had to the department and sign any document they desired to have signed to accomplish the purpose of dissolving the corporations and putting everything into one corporation, and when they got all through, plaintiff, Winzer and Barr would still have their right of accounting; that Winzer and Barr agreed to turn over their interests. Adjournment was had to enable the department and Kadyk to prepare the necessary papers. Meeting again in the afternoon, the papers were presented to Hassell, and he had plaintiff sign and acknowledge them. Hassell then asked Nelson how about Barr and Winzer and their documents. Nelson replied, "You forget I am running this thing and you are not running it."

Pursuant to the action taken at this meeting and the papers executed, the credit to the plaintiff of approximately $25,000 on the books of the holding company was canceled; the holding company and the affiliated companies were dissolved, all assets being transferred to the Casualty company and all liabilities being assumed by it; Palmer released to the secretary of the Casualty company his interest in the 805 shares of stock assigned to him June 12, 1933 by plaintiff, "so that the said shares may be reissued pursuant to a resolution adopted by the stockholders of the Finance and Investment Company, a corporation, on the 28th day of June A. D. 1933, which resolution distributes a certain block of eight hundred five (805) shares of said stock issued to T. H. Reiter" (plaintiff).

June 28, 1933 the holding company held 3,337 shares of the Casualty company stock, made up as follows:

1,212 shares in the name of the holding company; 1,950 shares in the name of Barr, being the stock delivered by plaintiff for the purchase of Barr's controlling interest in the Eastern Underwriters Corporation; and 175 shares which had been deposited by Winzer. Barr became the holder of 1,950 shares then in his name, 1,061 of the 1,212 shares in the name of the Casualty company, and 704 shares of certificates aggregating 805 shares previously indorsed and delivered by plaintiff to Palmer, making a total of 3,715 shares. Winzer became the holder of 427 shares, made up of the 175 shares previously delivered by him to the holding company, 151 of the 1,212 shares held in the name of the Casualty company, and 101 of the 805 shares formerly held by plaintiff. The remaining 10,100 shares, which Barr had claimed belonged to the holding company and as to which Palmer had received an assignment of plaintiff's interest on June 12, were, so far as plaintiff then knew, held by the banks as collateral for plaintiff's loans, which loans had been assumed by the holding company. As a matter of fact the 5,050 shares deposited with the Lake Shore Trust & Savings Bank had been acquired by Fitzgerald at a private sale and without plaintiff's knowledge. However, by agreements then executed, it was provided that if and when these 10,100 shares of stock were returned to plaintiff, he should deliver to Barr 1,982 shares, and to Winzer 285 shares of stock, leaving plaintiff the owner of 7,833 shares of the 14,805 shares held by him at the commencement of his dealings with Barr.

When plaintiff returned to Chicago, on the day after the meeting of June 28, he received a letter from the Lake Shore Trust & Savings Bank dated June 27, 1933 advising him of the sale of the stock pledged with the bank as collateral to Fitzgerald on June 23, inclosing plaintiff's canceled note and a check for $286.56, representing the excess of the proceeds after certain deductions itemized in the letter. Plaintiff retained this

amount. This was his first information that Fitzgerald had purchased the stock. Certificate for these shares was issued to Fitzgerald September 21, 1933 by Barr and Morris, vice president and secretary of the company. In August 1933 the 5,050 shares of plaintiff's stock in the Casualty company pledged with the Cosmopolitan State Bank, with draft for $4,697.82 drawn on O. C. Moore, was forwarded to the Springfield Marine Bank of Springfield, Ill. The draft was paid by someone other than Moore and the stock delivered by the bank, but not to Moore. Moore testified that he knew nothing of the transaction, paid nothing on account of the stock and never authorized the use of his name in connection with the transactions. Certificate for these shares was issued in the name of Moore September 21, 1933 by Barr and Morris. After consolidation of the Casualty company and the United States Underwriters Company, hereafter shown, this certificate was returned to the company, bearing a purported indorsement by Moore. He denies making or authorizing the indorsement. The record does not disclose the further disposition of these shares. By these transfers plaintiff was divested of all his stock in the Casualty company.

In July 1933 Palmer held a meeting in his office at Springfield of officials of the Illinois Casualty Co., the Illinois National Casualty Co. (the company involved here), and the United States Underwriters Company, a reciprocal exchange at Jacksonville, Ill., and stated that he thought the three companies might get together with a view of merging. Pickering, who represented the Illinois Casualty Co., insisting that if there was to be a merger, they (the Illinois Casualty Co.), wanted to run the new company, withdrew from the meeting and his company was eliminated from the proposed merger. Further negotiations concerned only the Casualty company and the United States Underwriters Company.

In August 1933 William W. Heise, who had been in the insurance business in Chicago since 1916, was desirous of obtaining control of an Illinois casualty company; he had $125,000—$25,000 in cash and and $100,000 in securities—to invest; the casualty company involved here was brought to his attention; he saw Fitzgerald in his office in Springfield and was taken to Nelson's office in the insurance department; Heise had known Nelson for some time; he was given the original audits of the Casualty company and of the Underwriters Company and told by Nelson that upon a consolidation of the two companies the assets would be worth more than $200,000; that the department was anxious to clear up the Casualty company, which was in the red; that Palmer would see that Heise got control of 51 per cent of the stock; that Barr should retain the presidency of the Casualty company and Heise would become chairman of the board and have a majority of its members. Heise went to Jacksonville to talk with the men connected with the Underwriters. On returning to Springfield he saw Palmer and said, "Ernie, we are down here to buy that Illinois National Casualty Co." Palmer replied, "You work out the details with Nelson. Anything he works out with you, why it is all right. He has got that matter in charge." Heise discussed the matter further with Nelson and asked how they were going to make the reciprocal join with the Casualty company, and Nelson replied, "They will do exactly what we want them to do. We have got them where we want them, and we will deliver." Heise made a further investigation and objected to some of the assets of the Casualty company. Nelson told him, "You should worry about that. Palmer is going to be in office for four years, and we will see you through, and you can take my word for it, Bill, that if you make this deal you will never be disturbed, and if you object to this Mausoleum and this Hoskins mortgage down here, you got four years to

make it up in, and I will also see that these companies are put together so that you will actually get a $200,000 net real worth company.'' October 7, 1933, Palmer as director of insurance of the State of Illinois approved the articles of consolidation of the Casualty company and the United States Underwriters Company under the name of the Illinois National Casualty Co., and the business has since been carried on under that name. Barr became president of the consolidated company and continued in that office, directing the affairs of the company until 1937, when he sold his stock, resigned as president, but continued to act as director for a year thereafter.

Do these facts, established by the uncontradicted testimony of plaintiff's witnesses and unquestioned documentary evidence, prove plaintiff's claim that his stock in the Casualty company was extorted from him by duress pursuant to a conspiracy? There are no inherent defects bringing this testimony within the exceptions which, as stated in *People v. Davis*, 269 Ill. 256, 270–271, permit a court to disregard uncontradicted testimony.

Plaintiff's basic claim is against Barr, Fitzgerald and Palmer. These defendants deny that a conspiracy existed. They ignore the threats of Conover, Nelson and McCullough. They claim that all that was done by Palmer with respect to the Casualty company, the affiliated companies and plaintiff's stock in them and his claims against the holding company, was done by Palmer acting within the scope of the authority of his office and with the consent of plaintiff; that Palmer as a public official is not responsible for the wrongs committed by his subordinates. The general insurance law (Ill. Rev. Stat. 1935, ch. 73) gave Palmer no authority to do what he did, and no authority under that law is claimed. Defendants rely on an emergency Act of May 11, 1933 (Ill. Rev. Stat. 1935, ch. 73, pars. 580–586), which expired June 30, 1935.

Authority under this Act is merely asserted. No analysis of the Act is made and no provision of it is cited to justify the assertion. Our examination of the statute fails to reveal any support of defendants' claim. The Act (sec. 1) declares an emergency with respect to financial and investment institutions, including the business of insurance, and that the provisions of the Act "are therefore necessary for the protection of the public as a whole, to preserve the stability of insurance companies, to prevent undue preference among the policyholders of said companies, and to conserve the income and assets of such companies for the benefit of their policyholders, beneficiaries and creditors." Section 2 authorizes the superintendent of insurance, subject to the approval and by direction of the governor of the State of Illinois, "to adopt, promulgate, modify, enforce or rescind from time to time such rules and regulations as may be deemed necessary for the purpose of carrying out the provisions of this act by *maintaining safe and sound methods for the transaction of the business of insurance,* for the purpose of safeguarding the interests of policyholders, beneficiaries, creditors and the public generally." (Italics ours.) Section 3 authorizes the governor and the superintendent of insurance, with the Governor's approval, to stay any foreclosure, etc., of any mortgage on a farm or homestead where such mortgage is owned or held by an insurance company which is subject to the provisions of the Act. Section 4 provides that "Nothing in this Act shall affect the authority of the Superintendent of Insurance to deal with impaired insurance companies under the provisions of existing law." Section 5 provides: "Any insurance company violating any rule or regulation promulgated in conformity with this Act shall forthwith be subject to having its authority, and that of its agents, to transact business in this State revoked." The authority of the superintendent of insurance to deal with the impaired conditions of insur-

ance companies under the provisions of existing law, mentioned in section 4, is found in sections 2, 3 and 4 of an Act of 1925, as amended in 1929. (Ill. Rev. Stat. 1935, ch. 73, pars. 496–498.) Section 2 provides that whenever any resident company is insolvent or in such condition that its further transaction of business will be hazardous to its policyholders or to its creditors or to the public, or such that it could not meet the requirements for organization and authorization as required by law,.or when such company has neglected or refused to observe an order of the director of insurance (later called superintendent) to make good within the time prescribed by law any deficiency whenever its capital or reserve shall have become impaired, the director shall report any such case to the attorney general of this State, whose duty it shall be to apply by petition of the director to the circuit court for an order directing the company to show cause why a receiver should not be appointed, etc. Section 3 provides that after a full hearing the court "shall enter an order either denying the application or finding that sufficient cause exists for the appointment of a receiver to take possession of and conduct the business of such company until the further order of the court having jurisdiction in the premises." By other provisions of the statute it is provided that the director shall name the receiver, who shall give a bond to be fixed by the court payable to the People of the State of Illinois and conditioned for the faithful performance of the duties of such receiver.

The rules and regulations which the superintendent of insurance and the governor were authorized to promulgate under section 2 were such rules and regulations as were deemed necessary for the maintenance of safe and sound methods for the transaction of the business of insurance. This means rules and regulations for the conduct of the business of insurance, applicable generally to all insurance companies of the

same class and to be observed by companies conducting their own affairs. The penalty prescribed by the statute was for violation by an insurance company of any rule or regulation promulgated in conformity with the Act, and was limited to the revocation of the authority of the company and that of its agents to transact business in the State. A company could violate the rules or regulations only when conducting its business through its officers and agents, and the penalty prescribed could be imposed only for violations by such officers and agents when the company, and not an appointee of the superintendent of insurance, was conducting its business. Specific preservation of the authority of the superintendent of insurance under the then existing law to deal with impaired insurance companies, negatived any intent to vest him with power to seize individual companies and operate them through a conservator or other appointee. It manifested an intent to confine him to the orderly processes then provided under which an insurance company would have a hearing in court before being deprived of the control of its business, and the actions of the receiver, if one were appointed, would be controlled and directed by the court according to established legal rules. No general rules or regulations designed to maintain safe and sound methods for the transaction of the business of insurance were promulgated. The order placing Barr in charge of the assets and business of the Casualty company contained no rule for the regulation of the business of that company, unless the direction to segregate future premiums be so considered. In all other respects the unrestrained will of Palmer controlled. No statute gave him the power he exercised in appointing Barr conservator of the Casualty company and conducting its business through him. He was also without authority as superintendent of insurance to demand or receive plaintiff's stock in the Casualty company and the holding company and to

surrender it for redistribution pursuant to the transactions of June 28, 1933. The right to this stock was based on the merger agreement between plaintiff, Barr and Winzer, and plaintiff's alleged breach of the contract. As said in the very recent case of *People v. Williams,* 392 Ill. 224, 239, in speaking of the present insurance law, which in respect to the matters now under consideration is not essentially different from the laws of 1933: "The determination and enforcement of contract rights are proper matters for disposition in the courts without intervention from the Director, or Department, of Insurance." No theory has been suggested to justify Palmer's interference with and control of the shares of stock and business of a non-insurance company like the holding company.

The acts shown by the evidence being beyond the scope of Palmer's authority, his official position affords no immunity from liability. This immunity is restricted to acts within the scope of the official's authority. Mechem on Public Offices and Officers, sec. 638; *People ex rel. Barber v. Hargreaves,* 303 Ill. App. 387, 397. Nor can he claim the benefit of the rule contended for by him and his surety that a public officer of the government in the performance of his public functions is not liable to third persons, either for the misfeasances or positive wrongs, or for the nonfeasances, negligences or omissions of duty of his official subordinates. This rule is also limited to acts in performance of the public functions of the official, as stated in Mechem on Public Offices and Officers, section 789, cited by defendants. The rule is subject to exceptions, and the superior, as stated by Mechem (section 790), is liable where he has directed, authorized or co-operated in the wrong of his subordinates.

Moreover, plaintiff's claim is based on a charge of conspiracy. Every conspirator is liable for all of the acts of each of his co-conspirators committed before or after his entry into the conspiracy. *Spies v.*

*People,* 122 Ill. 1; *Baker v. State Bank of Akron,* 112 Ind. App. 612, 44 N. E. (2d) 257; *Silliman v. Dobner,* 165 Minn. 87; 11 Am. Jur., Conspiracy, sec. 48. This liability is independent of the relation of master and servant or principal and agent. As said in *Schultz v. Frankfort Marine Accident & Plate Glass Ins. Co.,* 151 Wis. 537, 547: "It is argued that the defendant Gordon was not master of Paczkowski or Heyer, but was like them an employee of the detective agency, and that the insurance company and Bacher were not responsible for excess of zeal or excess of authority on the part of Heyer or Paczkowski. This is also an erroneous view of the law. When persons are charged as conspirators and a *prima facie* case of conspiracy is shown, the acts and sayings of each conspirator, whether a defendant or not, in furtherance of the unlawful conspiracy, is evidence against his co-conspirator, not under the rule *respondeat superior,* but under that rule of the conspiracy law which makes each the agent and spokesman of all in the unlawful enterprise. The plaintiff in a suit for civil damages caused by conspiracy may invoke, for the purpose of connecting any person with the tort, either the rule *respondeat superior* or the rule above stated relative to the acts and admissions of conspirators, and this is so elementary as not to require the citation of authority in its support."

■■ A conspiracy is an agreement or combination between two or more persons to do an unlawful act or to do a lawful act by unlawful means. It may be proved by indirect or circumstantial evidence. *Chicago, W. & V. Coal Co. v. People,* 214 Ill. 421, 453; *Harding v. American Glucose Co.,* 182 Ill. 551, 617; *The Tribune Co. v. Thompson,* 342 Ill. 503, 529. It must generally be proved by such evidence. Here the steps taken by the various persons involved dovetailed and each act contributed directly to the ultimate goal of acquiring, without payment of any consideration, all

of plaintiff's stock in the Casualty and holding companies.

By order of Palmer dated May 13, 1933 plaintiff was removed as managing officer of the Casualty company and its affairs were placed in the hands of Barr as "conservator" acting under the direction of Palmer. Ostensibly this was done because plaintiff had signed a false annual report for 1932 and had inflated assets on the books of the company. But Morris and Winzer, who co-operated with plaintiff in the alleged wrongdoing, were not molested. Morris, secretary of the company, who like plaintiff had signed the false report in blank, was retained in the service of the "conservator," and in the June 15, 1933 report of Russell, examiner of the department, his continued association with any company assuming the business of the Casualty company was said to be essential to the preservation of the two valuable assets of the company—a well developed agency plant and a substantial volume of good business written. Winzer, the auditor and financial adviser of the company, who prepared the false annual report and was primarily responsible for much, if not all, of the assets being carried at an inflated value on the books of the company, was permitted to retain his stock and, in addition thereto, to share in the division of the spoils when plaintiff was finally divested of all of his stock on June 28, 1933. Fitzgerald, attorney for the conservator, was at the Lake Shore Trust & Savings Bank June 6 to obtain the 5,050 shares of the capital stock of the Casualty company pledged by plaintiff as security for a loan which the holding company was to pay. June 9 the insurance department directed plaintiff to appear on June 12 at the Chicago office of the department for a hearing to be conducted by McCullough of that office. June 10, Barr as conservator of the Casualty company advised the two banks holding plaintiff's stock as collateral to his loans that this stock belonged to the holding company

and should not be surrendered by the banks without notice to Barr as conservator of the Casualty company and of the holding company; that if the banks were unwilling to carry the loans, he, Barr, might arrange through the department of insurance to pay the banks and take up the stock. June 12 McCullough demanded, under orders of the boss, that plaintiff assign and deliver all his stock of the Casualty company, being the 10,100 shares pledged with the banks and 805 additional shares, together with all his shares in the holding company. Accordingly, on this date plaintiff made the requested assignments to Palmer as superintendent of insurance and delivered the assignments and certificates of stock to him. June 15, Russell in his report, heretofore mentioned, in advising refinancing of the Casualty company suggests the possibility of getting plaintiff's stock pledged with the Chicago banks and selling it to replace part of the worthless assets. June 23 plaintiff's 5,050 shares of stock pledged as collateral with the Lake Shore bank were sold to Fitzgerald at a private sale. June 26 the department of insurance notified plaintiff to appear at its Springfield office on June 28. Plaintiff appeared and the transactions detailed above were had, resulting in plaintiff being divested of all interest in the stock of the Casualty and holding companies. To effect this, Palmer released to the Casualty company the interest in the stock he had acquired from plaintiff. In July he called and personally presided over a meeting of representatives of the Casualty company, the United States Underwriters Company, a reciprocal exchange at Jacksonville, Ill., and the Illinois Casualty Co., where he urged consolidation of the three companies. The Casualty company and the United States Underwriters Company were consolidated with the official approval of Palmer required by law. In speaking of this consolidation in his verified answer filed herein, Palmer says ". . . that on account of the economic condi-

tions then prevailing and the fact that many banks, insurance companies and other financial institutions were in a perilous condition, he (Palmer) was inclined to and did, in his belief that such consolidation might have the effect of saving both companies, allow great liberality in the figures which were set up as the financial basis for such consolidation, and while this financial statement did show the net worth of Illinois National Casualty Company to be approximately $123,000, in truth and in fact it had no net worth whatever, but there was no discrimination against the policyholders or stockholders of the United States Underwriters Company, for the reason that it, too, was without net worth, but it was necessary that the two companies together be able to show a total net value of at least $200,000 for capital stock purposes, and it was advisable that something in addition thereto be shown by way of surplus; and this defendant admits that if he had adhered to the strict letter of the law and had insisted that the companies about to consolidate have actual net assets of not less than $200,000, the inevitable result would have been that such consolidation would have been impossible, and that both of said companies would have had to be liquidated . . .''

■■ Were the means employed to deprive plaintiff of his stock unlawful? 17 Am. Jur., Duress, sec. 6, page 878, says: ''To constitute duress, it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils; as inconvenience and loss by the detention of property, loss of property altogether, or compliance with an unconscionable demand.'' In *Carpenters' Union v. Citizens Committee to Enforce Landis Award*, 333 Ill. 225, 247, the court said: ''Coercion is as easily accomplished without threats of violence as with them, and fear of loss of or injury to business unless one submits to demands is as effective as fear of violence to his

person." Where duress is exerted it is immaterial that the plaintiff acquiesces in the demands or accepts an arrangement beneficial to him at the time. As stated by Mr. Justice HOLMES in *Union Pac. R. Co. v. Public Service Commission*, 248 U. S. 67, 70: "Of course, it was for the interest of the Company to get the certificate. It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called." Similarly, our Supreme Court in *Chicago & E. I. Ry. Co. v. Miller*, 309 Ill. 257, 260, said: "Conduct under duress always involves a choice, but this court has held that the making of a choice under such circumstances does not estop the person acting under duress from later asserting his rights."

The duress charged is the threat of criminal prosecution for making a false annual report and the threat of liquidation of the company if the demands upon the plaintiff were not complied with. Plaintiff, citing *People v. Cepek*, 357 Ill. 560, says he is not guilty because he signed the report in blank without knowledge that the false entry relating to the Liberty bonds was to be inserted. His innocence or guilt is immaterial. If innocent, the threat was plainly unlawful. If guilty, none of the persons involved here suffered any pecuniary loss or acquired any right in plaintiff's stock by reason of the false report. Defendants, therefore, are not in the position of a person seeking to settle a just claim arising from the commission of a crime. The false report and plaintiff's alleged breach of the merger or consolidation agreement are wholly unconnected. The maxim of unclean hands has no application. *Carpenters' Union v. Citizens Committee to Enforce Landis Award, supra* (pages 247–252).

17 Am. Jur., Duress, sec. 13 says: "Another line of authorities, however, supported, it is believed, by the

better reasoning, deny that the threats must be of an unlawful arrest, and hold that duress may be exercised through threats of prosecution for an offense of which the party whose prosecution is threatened is actually guilty.'' The reason for this rule is stated in *American Ry. Exp. Co. v. Hicks*, 198 Ky. 549, 557, where the court said: ''But the weight of authority is that threats of a prosecution for an offense of which the party is actually guilty, if they induce the threatened party to pay money that he would not have voluntarily paid, amount to duress for which a recovery can be had. The reason for the rule seems to be that in such case the threatener has perverted and abused the laws which were made for another purpose, and he is in no position to claim the benefits of a contract obtained in that way.'' See *Morse v. Woodworth*, 155 Mass. 233, 251.

For like reasons the threat to use the power of the department to force liquidation of the Casualty company in which plaintiff held so many shares of stock, was wrongful. This threat was not invoked to compel compliance with demands which the insurance department had a right to make, such as a demand to restore an impaired capital of a company under its supervision. The demand made on plaintiff related to his stock in the Casualty company and his stock in and claims against a non-insurance company over which neither Palmer nor his department had any jurisdiction.

The fact that plaintiff parted with all his stock in the Casualty company, constituting practically his entire estate, without receiving anything in return is sufficient proof that he and his attorney acted under influence and fear of threatened prosecution and liquidation of the company. As said in *Elsasser v. Miller*, 383 Ill. 243, 252, ''. . . if, however, a person has been induced to part with a thing of value for little or no consideration, equity will seize upon the slightest

circumstance of oppression, fraud, or duress for the purpose of administering justice in the case at hand. (9 Am. Jur. 370; 4 R. C. L. 500; *Kronmeyer v. Buck*, 258 Ill. 586.)'' *Rees v. Schmits*, 164 Ill. App. 250. Plaintiff's stock having been taken from him by this illegal combination, each party to the conspiracy is liable for all of plaintiff's damages, even though some of them may not have profited by the illegal acts. *Fountain Spring Park Co. v. Roberts*, 92 Wis. 345, 349; *Zinc Carbonate Co. v. First Nat. Bank*, 103 Wis. 125, 135; *Baker v. State Bank of Akron*, 112 Ind. App. 612, 44 N. E. (2d) 257, 260.

The Casualty company is made party defendant, and it is insisted that, because at the time of the transactions being considered it was not acting through its corporate officers but through a conservator appointed and directed by the superintendent of insurance, it is neither a necessary nor a proper party. The company, however, received certain assets and assumed certain liabilities of the corporations dissolved under the June 28, 1933 arrangement. It also received certain of plaintiff's stocks, the disposition of which is not made clear by the record. It is therefore a proper party upon an accounting.

The surety company on Palmer's official bond objects that the complaint against it is defective in that no copy of the bond was attached to the complaint. It admits that it signed the bond, conditioned for the faithful performance of Palmer's duties as superintendent of insurance, but denies that the bond was for the protection of those with whom Palmer might deal and act during his term of office, as alleged in the complaint. When this case was before us on a former appeal (291 Ill. App. 30) we did not pass on the sufficiency of the complaint. The bond executed by the surety company was an official bond of a public officer of the State and a part of the public records, and plain-

tiff cannot be permitted to avoid attaching a copy of the bond or stating its relevant terms by alleging that ". . . its exact contents, words and figures are in possession, custody and knowledge of" Palmer and the surety company. The bond was not produced and no evidence was given as to its contents. Therefore, it must be treated as a bond conditioned only for the faithful performance of Palmer's duties as superintendent of insurance. This, however, does not make the company liable in the instant case. Plaintiff's whole cause of action is based upon the claim that Palmer as superintendent of insurance was without power or authority to appoint a conservator for the Casualty company and to assume control and direction over it and its affiliated companies and of plaintiff's stock therein. This, as we have held, was outside the scope of Palmer's official duties. For acts beyond the power or scope of the authority of the officer the surety is not liable. *Orton v. City of Lincoln,* 156 Ill. 499, 502–503; *People for use of Fleishman v. Sowell,* 186 Ill. App. 617, 620–621; *Howard v. United States,* 87 F. (2d) 243, 246, 247, 249.

The defendants Barr, Fitzgerald and Palmer strongly insist that the appeal should be dismissed and the decree of the trial court affirmed because of plaintiff's failure to comply with the rules of this court by neglecting to abstract the numerous exhibits in the record, to many of which reference had to be made in the determination of the appeal. Plaintiff's counsel was grossly derelict in the preparation of the abstract, and we were obliged to go to the original exhibits filed with the record in order to fully inform ourselves of the facts in the cause. However, defendants supplied some of the omissions of plaintiff. Because of the matters involved we have felt justified in overlooking plaintiff's failure to comply with the rules and have gone to the record, as this court did in *Central Invest-*

*ment Co. v. Melick,* 162 Ill. App. 474, cited by defendants. The motion to dismiss the appeal for failure to file a proper abstract is denied.

Defendants elected at the close of plaintiff's evidence to submit the cause for decision on the merits on that evidence. Civil Practice Act, sec. 64 (4) [Ill. Rev. Stat. 1945, ch. 110, par. 188, subpar. (4); Jones Ill. Stats. Ann. 104.064, subpar. (4)]; *Kanauske v. Clark,* 388 Ill. 357. The decision of the trial court was favorable to defendants and the complaint was dismissed for want of equity. Prior to the enactment of the statute defendants were not permitted to present evidence on reversal of a decree dismissing a complaint for want of equity at the close of plaintiff's evidence, the cause being remanded with directions to enter a decree for plaintiff in conformity with the opinion. *Thorworth v. Scheets,* 269 Ill. 573; *Koebel v. Doyle,* 256 Ill. 610. We consider this to be the proper practice under the statute. As said in the *Kanauske* case, p. 360: "It will be noted that the statute does not change the rule, unless the decision on defendant's motion is adverse to the defendant. If the decree in this case be considered as disposing of the motion, then it must be conceded it was favorable to the defendant. Under such circumstances, the statute has no application . . ."

The decree of the court as to defendant surety company is affirmed. The decree as to the remaining defendants is reversed and the cause is remanded with directions to enter a decree as to them in accordance with the views expressed herein.

*Decree as to surety company is affirmed. Decree as to remaining defendants is reversed and cause remanded with directions.*

MATCHETT, P. J., concurs.

O'CONNOR, J., dissents in part: I think it is clear that the defendant, Palmer, did not enter into any conspiracy to defraud anyone. He was appointed in January, 1933, by the governor of the state as Director of

Trade and Commerce and continued to act in that capacity until July 1, 1933, when he was appointed Director of Insurance, since which time he has served as Director of Trade and Commerce and also Superintendent of Insurance; that what he did was with the advice and assistance of the Attorney General of the State of Illinois; his sole purpose was to save the defendant Casualty Company for its policyholders and stockholders. The evidence discloses that the Casualty Company was not in a sound financial condition in 1933, at which time the record shows, and the court will take judicial notice of the fact that under the financial condition of the country there was a great depression. *Straus v. Chicago Title & Trust Co.*, 273 Ill. App. 63; *Atchison, Topeka & Santa Fe Ry. Co. v. United States*, 284 U. S. 248.

In my opinion the judgment of the Superior court of Cook county as to Palmer and his surety should be affirmed.