**SHIELDS ENTERPRISES, INCOR-PORATED, a Kansas corporation, Plaintiff–Appellant,**

v.

**FIRST CHICAGO CORPORATION, a Delaware corporation, First National Bank of Chicago, a national bank, First Capital Corporation of Chicago, an Illinois corporation, et al., Defendants–Appellees.**

No. 91–2134.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1992.

Decided Sept. 21, 1992.

Rehearing and Rehearing En Banc Denied Nov. 3, 1992.

Stephen Novack (argued), Kenneth S. Schlesinger, Karen L. Levine, Novack & Macey, Chicago, Ill., for plaintiff-appellant.

Dan K. Webb, Scott J. Szala (argued), Kenneth T. Kristl, Kevin E. White, Timothy P. O'Connor, Winston & Strawn, Peter J. Kilchenmann, Lynn A. Goldstein, Cynthia H. Hyndman, Chicago, Ill., for defendants-appellees.

Before CUDAHY, COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

Shields Enterprises, Inc. (SEI) sued the First Chicago Corporation and Richard Gallagher, a First Chicago officer (all of whom we shall refer to collectively as "First Chicago" unless context otherwise requires), alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (RICO), sections 1964(b), (c), and (d), as well as various supplemental state law claims. This case presents a familiar scenario: a business arrangement gone sour results in a federal lawsuit by one of the disgruntled partners for triple damages under RICO. Early on, the district court dismissed with prejudice SEI's state law tort claim for damages for economic duress. Subsequently, the court granted First Chicago's motion for summary judgment on SEI's RICO claims, and dismissed SEI's other supplemental state law claims without prejudice 762 F.Supp. 1331 pursuant to *United Mineworkers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). SEI appeals, and we affirm in part, reverse in part, and remand.

## I.

Since we are reviewing a grant of summary judgment against SEI, we set out the facts in the light most favorable to SEI, and draw all reasonable inferences in SEI's favor. See *Hammond v. Fidelity and Guaranty Life Ins. Co.*, 965 F.2d 428, 429 (7th Cir.1992). Viewed in that light, the record reveals the following. In the spring of 1983, SEI, Martin Cooper, and Arlene Harris formed Cellular Business Systems, Inc. (CBSI), a non-public corporation specializing in computer billing services for the cellular telephone industry. SEI, Cooper, and Harris each received one-third of CBSI's outstanding stock in exchange for cash and services.

Although the cellular telephone industry was in its infancy when CBSI was formed, it grew rapidly. This, in turn, led CBSI to grow. But this growth required increased capital, and CBSI's shareholders came to realize that to capture a larger share of the market for cellular billing services, they would have to find a new source of funds since they had planned to invest only a limited amount of money themselves. Enter First Chicago, which in 1984 became interested in investing in CBSI. While pondering how large an ultimate investment it should make, First Chicago provided interim financing to CBSI by making several loans totaling $1.2 million.

By March 1985, First Chicago had decided to make a substantial equity investment in CBSI. First Chicago agreed with CBSI's shareholders to invest a total of $8 million in CBSI in six separate installments over one year. In return for its investment, First Chicago was to own 52% of CBSI's stock. The average price per share was slightly under $20. The stock sale agreement specifically excluded any rights for SEI, Cooper, and Harris to participate in future CBSI stock sales. The agreement contemplated that First Chicago and the other shareholders would be involved together until at least 1992.

At the same time, SEI, Cooper, and Harris agreed to contribute their CBSI stock to a new corporation, CBSI Technology Group, Inc. (Technology Group), in exchange for receiving one-third apiece of Technology Group's stock. SEI, Cooper, and Harris also agreed that they would not sell Technology Group's CBSI stock without their unanimous consent. They also granted Technology Group, and then each other, rights of first refusal if any shareholder received an offer to buy his or her interest in Technology Group.

During the summer of 1985, CBSI experienced rapid success in capturing market share. By the fall, it had captured 80% of the relevant market. But as before, this rapid growth created a pressing need for new capital. CBSI's impressive performance in capturing market share caused it to overextend itself in servicing. CBSI's expenses consistently outstripped its revenues, and CBSI was projected to run out of cash by the end of June 1986 absent another capital infusion.

To meet this need for cash, First Chicago agreed to accelerate its last three stock purchases under the stock sale agreement. This supplied an immediate $3 million to CBSI in the fall of 1985. First Chicago also proposed an additional $2 million stock sale. The proposed price per share was $4, well below the average price per share of First Chicago's original investment. First Chicago at first insisted on purchasing all the additional stock itself. The owners of Technology Group, however, protested that the $4 per share price was ridiculously low, and feared that if First Chicago bought all the stock at that price, Technology Group's equity position in CBSI would be severely diluted.[1] Technology Group's owners therefore urged First Chicago to set a higher price for the stock. First Chicago refused to change the price.

Because it feared unreasonable dilution of its position, SEI insisted that First Chicago at least allow Technology Group to purchase a proportionate share of the new stock, even though Technology Group's owners did not desire to make any additional investment at that time. First Chicago finally relented and in mid-December 1985 First Chicago and Technology Group each purchased stock in amounts that approximately maintained the parties' proportionate interests in CBSI (about 55% for First Chicago and 45% for Technology Group). SEI funded Technology Group's purchase because neither Cooper nor Harris chose to invest any more cash in CBSI.

Late in 1985, Cooper decided he "wanted out" of CBSI. Cooper had been acting as CBSI's Chief Executive Officer and Chief Operating Officer and found his position very stressful. Cooper decided that one way to end his involvement with CBSI was to sell the company.[2] Thus, in late 1985, Cooper met with John LaMacchia, president of Cincinnati Bell Information Systems, Inc., to discuss a possible sale of CBSI to Cincinnati Bell. Cooper reinitiated these discussions with LaMacchia in March 1986.

Cooper had begun negotiating with La-Macchia unbeknownst to First Chicago. When First Chicago's representatives found out, they were somewhat surprised that Cooper would be negotiating to sell CBSI without the majority shareholder's knowledge. Upon finding out about the negotiations, First Chicago at first took a cautious approach to the sale, stating that it might be best to solicit bids from other possible buyers to obtain the maximum price for CBSI. However, by mid-April, First Chicago had decided that it wanted to sell CBSI to Cincinnati Bell at the price Cincinnati Bell was willing to pay, without shopping CBSI to any other potential buyers.

---

1. The evidence showed that First Chicago computed the $4 per share price based upon the number of additional shares they needed to own 65% of CBSI's stock. SEI presents this as proof of some devious scheme to dilute Technology Group's interest, but we doubt the evidence carries that inference. The original investment agreement contemplated that First Chicago would own 52% of CBSI's stock for $8 million. The investment of $10 million for 65% of CBSI's stock represents the same investment to ownership share ratio. In other words, $8/52 = $10/65$. By setting the price at $4 per share, then, First Chicago simply sought to ensure that each dollar it invested in CBSI purchased an equal share in the company's ownership.

2. SEI says that another reason for Cooper's disenchantment was First Chicago's constant threats to dilute his position in CBSI. SEI supports this assertion with references to statements by First Chicago representatives to Cooper that they would "dilute the hell out of him." Cooper, however, never testified to any such statements. SEI's references are to statements by other witnesses that Cooper had related the dilution threats to them. These statements are hearsay, and thus are insufficient to support SEI's assertion that First Chicago threatened to further dilute Cooper's interest in CBSI.

On April 17, 1986, LaMacchia met with Cooper, Richard Gallagher, a First Chicago officer and CBSI director, and T. Russel Shields, SEI's CEO and principal shareholder, to discuss the sale of CBSI to Cincinnati Bell. At this meeting, the parties reached an agreement in principle that called for Cincinnati Bell to pay CBSI's shareholders $13 million up front, and $7 million in the future contingent on CBSI's performance. On April 27, SEI, Cooper, Harris, and First Chicago entered an Allocation Agreement setting forth the distribution of Cincinnati Bell's payments to CBSI's shareholders.

Despite participating in the April 17 meeting, and signing the Allocation Agreement on SEI's behalf, Shields, unlike Cooper, did not want to sell CBSI. Shields thought that the price Cincinnati Bell was offering was far below CBSI's actual value. Shields also believed that by holding on to CBSI for a few more years, the shareholders could realize a much higher selling price. Shields' objection posed a formidable obstacle to CBSI's sale because of the agreement between Technology Group's shareholders requiring unanimous consent to any sale of Technology Group's CBSI stock. According to Shields, when he made his objections known to First Chicago's representatives, they told him, in effect, just to "shut up" so as not to blow the deal.

As a means to accommodate Cooper's desire to get out of CBSI while not selling his own firm's interest, Shields offered to have SEI buy Cooper's and Harris's Technology Group stock. Shields first made this offer in a phone conversation with Cooper on April 25. He reiterated his offer at a May 28 meeting, and made a formal written offer to Cooper and Harris on May 29.

According to SEI, First Chicago reacted to Shields' offer to Cooper and Harris by making a series of threats designed to dissuade Cooper and Harris from selling to SEI and to "force" CBSI's sale to Cincinnati Bell. Initially, SEI offered evidence that Don Kilpatrick, a First Chicago vice-president, threatened that if SEI refused to agree to CBSI's sale to Cincinnati Bell, First Chicago would issue and buy new low-priced stock to dilute Technology Group's interest; replace CBSI's management, installing Kilpatrick, whom SEI claims was not competent to run CBSI, as CEO; and terminate a consulting contract between SEI and CBSI. These threats were allegedly repeated several times.

On May 30, 1986, Shields met with Cooper, Robert Schwimmer (a CBSI board member involved in the negotiations to sell CBSI to Cincinnati Bell), and Gallagher to discuss the sale to Cincinnati Bell and SEI's offer to purchase Cooper's and Harris's Technology Group stock. According to SEI, Gallagher repeated the earlier threats First Chicago had made. He also threatened that unless SEI consented to the sale to Cincinnati Bell, Shields would be barred from CBSI's premises and First Chicago would not allow CBSI to borrow money from any source. At this meeting, Cooper rejected SEI's offer to buy his Technology Group stock, allegedly because of his fear of the dire consequences that would befall him and CBSI if he did so.[3]

On June 3, 1986, SEI finally capitulated, and CBSI's sale to Cincinnati Bell was closed. Cincinnati Bell ultimately paid almost $20 million for CBSI: $13 million at closing, and an additional $6.06 million in

---

**3.** SEI also asserts that First Chicago threatened to force Cooper to work for CBSI under "intolerable conditions" if he sold his Technology Group stock to SEI. Cooper himself did not so testify; in his deposition, Cooper stated only that he had a "vague recollection" that Schwimmer had said something "like that" to him. Shields testified in his deposition that Cooper told him about the alleged threat of "intolerable conditions." This, however, is hearsay and cannot be used to show that First Chicago actually made that threat to Cooper. In any event, nothing in the record spells out precisely what "intolerable conditions" Cooper faced if he did not capitulate to First Chicago's demands. Cooper did have an employment contract with CBSI, and there is evidence that First Chicago representatives told him that if CBSI was not sold to Cincinnati Bell, First Chicago would hold him to that contract. Thus, the only "threat" the record reveals concerning Cooper's employment is the threat to hold Cooper to his contractual obligation.

January 1988 as an early disbursement of Cincinnati Bell's contingent payout. Of this total, SEI received approximately $4.4 million. Although this represented a substantial profit to SEI, it claims that CBSI was worth much more—as much as $48 million—at the time it was sold. Thus, SEI alleges that First Chicago's allegedly wrongful acts caused SEI millions of dollars in damages and filed this suit to recover those damages and—in light of RICO's treble damages provision—more.[4]

## II.

Summary judgment is appropriate where no material issue of fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The standard for deciding whether to grant summary judgment mirrors that for deciding whether to grant a judgment as a matter of law (formerly known as a directed verdict or judgment notwithstanding the verdict) in a jury trial under Rule 50(a). In either case, the district court must enter judgment if, under the governing law, a reasonable fact-finder could not find for the nonmoving party. See *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 2510, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If a reasonable fact-finder could find for the nonmoving party, summary judgment is inappropriate.

■ SEI alleged that First Chicago violated RICO sections 1962(b), (c), and (d). Both sections 1962(b) and (c) require that SEI prove First Chicago engaged in a "pattern of racketeering activity."[5] RICO defines "racketeering activity" as any act "chargeable" or "indictable" under various state laws and a laundry list of federal laws, including extortion, 18 U.S.C. § 1951. But what exactly constitutes a "pattern" of racketeering (outside the obvious case of an organized crime syndicate's criminal activities) is a subject that has vexed the federal courts since RICO's enactment. RICO itself defines a "pattern" as "requir[ing] at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). However, while two racketeering acts are necessary to make a pattern, they normally are not sufficient. Something more, beyond a mere number of predicate acts, is necessary to establish a pattern. See *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). In *H.J.*, the Supreme Court held that besides showing a number of predicate acts, a plaintiff must also show that the acts are related and that they amount to or threaten continuing criminal activity. *Id.* at 239, 109 S.Ct. at 2900.

■ SEI alleges that First Chicago engaged in extortion by threat of economic harm, in violation of 18 U.S.C. § 1951. First Chicago allegedly committed extortion when it "forced" Technology Group's capital contribution by First Chicago's threatening to issue and buy new stock at an unreasonably low price to dilute Technology Group's interest. First Chicago also allegedly committed extortion when it used various threats to induce Cooper and Harris not to sell their Technology Group stock to SEI, and to induce SEI to agree to sell CBSI to Cincinnati Bell. SEI also alleges that First Chicago violated the Travel Act, 18 U.S.C. § 1952, by inducing Cincinnati Bell representatives to travel to Chica-

---

**4.** SEI's contention that CBSI was worth up to $48 million is not undisputed. SEI's valuation is based on internal First Chicago documents. Those documents, however, did not set out any hard and fast value; rather, they set out a range of possible values depending on various factual scenarios. Moreover, Schwimmer, who was appointed to CBSI's Board by Technology Group, testified that $20–$22 million was a "fair, reasonable" price.

**5.** Section 1962(d) prohibits conspiracies to violate sections 1962(a), (b), or (c). Although section 1962(d) does not on its face refer to a pattern of racketeering activity, SEI does not argue that its conspiracy claim can survive absent a showing that the defendants actually engaged in a pattern of racketeering activity (as opposed to simply agreeing to commit racketeering acts and committing some overt act in furtherance of that agreement). Therefore, we need not consider SEI's conspiracy claim separately from its substantive RICO claims.

go in connection with CBSI's sale to Cincinnati Bell.[6]

The parties do not dispute that First Chicago's alleged racketeering acts were related, in that they involved the same participants, victims, and methods of commission. See *H.J.*, 492 U.S. at 240, 109 S.Ct. at 2901. The question here is continuity: Could a reasonable jury find that First Chicago's alleged acts of extortion amounted to or threatened continuing criminal activity?

In *H.J.*, the Court described continuity as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its very nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2901. A party may demonstrate continuity over a closed period by "proving a series of related predicates over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. A party may also demonstrate continuity by showing that the predicate acts demonstrate "a specific threat of repetition extending indefinitely into the future," or that the defendant's predicate acts are "a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 242–43, 109 S.Ct. at 2902. In applying these principles, it is important to keep in mind that "Congress was concerned in RICO with long-term criminal conduct." *Id.* at 242, 109 S.Ct. at 2902. Thus, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy" the continuity requirement. *Id.*

Since *H.J.*, this court has decided a number of civil RICO cases involving the issue of continuity of an alleged pattern of racketeering activity. In none of these cases have we found a RICO pattern. See, e.g., *Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654, 663 (7th Cir.1992); *J.D. Marshall Int'l v. Redstart, Inc.*, 935 F.2d 815, 820–21 (7th Cir.1991); *Hartz v. Fried-*

*man*, 919 F.2d 469, 472–74 (7th Cir.1990); *U.S. Textiles v. Anheuser–Busch Co.*, 911 F.2d 1261, 1266–69 (7th Cir.1990); *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1150–52 (7th Cir.1990); *Sutherland v. O'Malley*, 882 F.2d 1196, 1203–05 (7th Cir. 1989). Despite this trend, we conclude that this case is different.

First Chicago emphasizes that our RICO pattern cases since *H.J.* show that short-lived criminal activity with a natural end point is not sufficiently continuous to constitute a RICO pattern. See, e.g., *Olive Can*, 906 F.2d at 1151. We agree with that general proposition but it does not control here. Most of our recent pattern cases were fraud cases involving only one scheme directed toward achieving one goal. See, e.g., *Redstart*, 935 F.2d at 821; *U.S. Textiles*, 911 F.2d at 1268–69; *Olive Can*, 906 F.2d at 1151; *Sutherland*, 882 F.2d at 1204–05. Repeated mailings in furtherance of a single scheme to inflict one fraudulent injury may be no indication of the underlying fraud's continuity. See *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir.1986) (Cudahy, J., concurring). This case, however, involves allegations of at least two separate schemes with distinct goals: the "forced" capital contribution and the "forced" sale of CBSI to Cincinnati Bell. Moreover, these two schemes encompass three different episodes of alleged extortion. First Chicago argues that this case involves only one scheme, emphasizing that SEI's own complaint pleaded only a single scheme "to extort and coerce the sale of minority stock in Cellular Business Systems, Inc...." But that is only a misleading partial quote from SEI's complaint; the sentence quoted goes on to refer to First Chicago's attempt to coerce "additional transactions among [CBSI's] shareholders." This is certainly broad enough to encompass schemes to coerce a capital contribution as well as to coerce the Technology Group shareholders to sell to Cincinnati

---

**6.** Whether or not First Chicago violated the Travel Act depends on whether it committed extortion in connection with CBSI's sale to Cincinnati Bell. See 18 U.S.C. § 1952(a) (prohibiting travel only to distribute the proceeds of an unlawful activity, or to further or otherwise carry on an unlawful activity). Therefore, we will not distinguish between the alleged extortion and Travel Act violations in our analysis.

Bell. In any event, the actual *evidence* in this case could lead a reasonable jury to conclude that two separate schemes existed.

The presence of two separate schemes, however, does not invariably mean that a pattern exists. Cf. *Hartz*, 919 F.2d at 472–73 (finding no pattern despite the presence of two separate schemes). Keeping in mind *H.J.*'s admonition that RICO is directed at long-term criminal conduct, First Chicago argues that even if multiple schemes exist, the presence of two schemes is less significant than the facts that First Chicago's alleged racketeering acts all occurred during an eight-month span and that the alleged racketeering activity had a natural ending point: the sale of CBSI to Cincinnati Bell. Once that end was achieved, any threat of future racketeering activity involving CBSI ceased. Thus, says First Chicago, as SEI has not suggested that extortion is the normal way First Chicago carries on its banking and other businesses, this looks like a case involving "predicate acts extending over a few ... months and threatening no future criminal conduct." *H.J.*, 492 U.S. at 242, 109 S.Ct. at 2902. Such activity does not meet RICO's pattern requirement. *Id.*

The inquiry is not so cut and dried as First Chicago suggests. First Chicago allegedly engaged in extortion three times over its eight-month relationship with CBSI: when it sought a capital contribution from the Technology Group shareholders; when it sought to prevent Cooper from selling his Technology Group shares to SEI; and when it wanted the Technology Group shareholders to consent to CBSI's sale to Cincinnati Bell. SEI has presented facts that suggest that whenever the Technology Group shareholders stood in the way of some goal First Chicago wanted to accomplish in relation to CBSI, First Chicago turned to extortion to accomplish its goal. This constitutes a "pattern" even in "common parlance"; we conclude it also could constitute a pattern under RICO. As the Court noted in *H.J.*, a plaintiff may show continuity by showing that "the predicates are a regular way ... of conducting or participating in an ongoing and legitimate RICO enterprise." 492 U.S. at 243,

109 S.Ct. at 2902. Evidence that a defendant resorted to extortion every time it encountered resistance to its goals for an enterprise could persuade a reasonable jury that extortion is the defendant's "regular way ... of conducting or participating in the enterprise."

That the final two alleged episodes of extortion were ultimately directed at one goal—CBSI's sale to Cincinnati Bell—and that any criminal activity ended when First Chicago accomplished that goal does not change the conclusion that a fact finder could determine that a pattern exists in this case. Continuity does not necessarily depend on a showing of actual long-term criminal conduct; a plaintiff may establish continuity by showing that the defendant's actions raised the threat of further criminal activity. *Id.* The allegation that First Chicago turned to extortion every time it wanted something from the Technology Group shareholders raises the inference that if the June, 1986 sale to Cincinnati Bell had not gone through, First Chicago would have continued to use wrongful threats to force the minority shareholders to do its bidding. This alleged threat could well have lasted a long time, since the parties contemplated being involved together in CBSI until at least 1992. This allegation constitutes a sufficient threat of continuity to satisfy RICO's pattern requirement. Cf. *Ikuno v. Yip*, 912 F.2d 306, 308–09 (9th Cir.1990) (sufficient continuity existed to meet RICO's pattern requirement even though defendant committed only two predicate acts—filing of false annual reports for company—and company had gone out of business because there was no evidence that defendant would have stopped filing false reports if the company had stayed in business).

Before moving on, we hasten to add that this case is far from over. We are not holding that First Chicago actually engaged in a pattern of racketeering activity, or that it even committed any predicate acts. We are merely holding that if First Chicago's alleged actions amounted to extortion, a jury could find that First Chicago engaged in a pattern of extortion. In the district court, First Chicago vigorously asserted that the "threats" it allegedly made

amounted to nothing more than the proper exercise of its rights as CBSI's majority shareholder and thus could not amount to extortion, which requires the *"wrongful use of actual or threatened ... fear...."* 18 U.S.C. § 1951 (emphasis added). First Chicago could very well have a point; some, if not all, of SEI's allegations of extortion appear dubious at first blush. However, since First Chicago has mentioned but not argued the issue in this court, we leave it to the district court to decide in the first instance whether a jury could find that First Chicago actually committed any extortion in this case.

### III.

■ SEI also appeals the district court's decision to dismiss with prejudice SEI's state law tort claim for damages caused by economic duress. According to SEI, First Chicago's threats caused SEI to consent to CBSI's sale to Cincinnati Bell at an unreasonably low price, causing SEI damages measured by the difference of the true value of SEI's interest in CBSI and the unreasonably low value that SEI received. The district court dismissed this claim because Illinois had never recognized a cause of action for damages for economic duress, SEI had not provided persuasive evidence that Illinois would recognize such an action, and federal court is not the place to press innovative state law claims. We agree with the district court's decision.

When it dismissed SEI's economic duress claim, the district court noted that no Illinois court had ever recognized a damage action for economic duress. Since that time, one Illinois appellate court has expressly rejected such an action. *Dahl v. Federal Land Bank Ass'n of Western Illinois*, 213 Ill.App.3d 867, 157 Ill.Dec. 242, 245, 572 N.E.2d 311, 314 (3d Dist.1991). In *Dahl*, the court noted that no Illinois court had ever "recognized duress as an independent cause of action giving a right to affirmative relief.... Duress has been available to avoid obligations, but not as an independent cause of action for damages." *Id.*

Since *Dahl*, two other Illinois appellate courts have considered economic duress claims. See *Lawless v. Central Produc-*

*tion Credit Ass'n*, 228 Ill.App.3d 500, 170 Ill.Dec. 530, 536–39, 592 N.E.2d 1210, 1216–19 (4th Dist.1992); *Butitta v. First Mortgage Corp.*, 218 Ill.App.3d 12, 160 Ill.Dec. 937, 941, 578 N.E.2d 116, 120 (1st Dist. 1991). Neither of these cases explicitly rejected the economic duress claim. But neither *Lawless* nor *Butitta* take a position on the existence of a claim for damages for economic duress. Instead, *Lawless* and *Butitta* held that the facts in those cases did not establish the plaintiffs' right to recover even if such a claim existed. Thus, *Dahl* is the only Illinois case to expressly decide whether an action for damages for economic distress exists in Illinois, and its holding is adverse to SEI's position.

We are bound to follow *Dahl* as authoritatively stating Illinois law absent a good reason to think the Illinois Supreme Court would reject *Dahl*. *Tippecanoe Beverage v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 638–39 (7th Cir.1987). SEI argues that we should refuse to follow *Dahl* based on several cases SEI says have established a damage action for economic duress in Illinois, or that at least show that the Illinois Supreme Court would reject *Dahl*. Without going into detail, it suffices to say that none of the cases SEI cites either recognize an economic duress claim for damages or persuade us that the Illinois Supreme Court would reject *Dahl*.

The only Illinois Supreme Court case SEI cites is *Doremus v. Hennessey*, 176 Ill. 608, 52 N.E. 924 (1898). *Doremus*, however, involved a conspiracy by competitors to destroy the plaintiff's business by inducing others to break contracts with her, refuse to work for or with her, and otherwise act to harm the plaintiff's business. *Doremus* was not an economic duress case (that is, a case where a defendant induces a plaintiff to do something the plaintiff wouldn't otherwise do by threats of economic harm) and in no way establishes that cause of action or indicates how the Illinois Supreme Court would rule if asked to establish that cause of action.

Among the Illinois appellate court cases SEI cites is *Reiter v. Illinois National Cas. Co.*, 328 Ill.App. 234, 65 N.E.2d 830 (1946), *reversed on other grounds*, 397 Ill. 141, 73 N.E.2d 412 (1947). *Reiter* involved

a conspiracy among several defendants to force the plaintiff to divest his stock in an insurance company by threats of dire consequences if he did not divest. See *id.* 65 N.E.2d at 843–44. *Reiter* did hold that these threats constituted unlawful means to deprive the plaintiff of his stock. But *Reiter* was an action for an accounting and for the return of the stock, not an action for damages. Thus, *Reiter* does not establish the action for damages that SEI seeks.

SEI's best case, at least factually, is *Holzman v. Barnett*, 192 F.2d 113 (7th Cir.1951). *Holzman* actually did involve a claim for damages caused by a transaction plaintiff entered into because of economic duress. However, in *Holzman* both the court and parties seemed to assume the existence of a damage action for economic duress. There was no discussion of whether Illinois law recognized such an action, and from what we can tell from the opinion, it is unlikely that either party even raised the issue. It almost goes without saying that a Seventh Circuit case that does not squarely face a state law issue provides no clue as to how the Illinois Supreme Court would decide that issue.

Absent clearer evidence of how the Illinois Supreme Court would decide, we are unwilling to "speculate on any trends in Illinois law," especially when an Illinois appellate court has expressly rejected the action SEI seeks to bring. See *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987). Plaintiffs seeking to bring novel state law claims should "present those claims initially in state court." *Id.* This brings us to SEI's request to vacate the district court's dismissal with prejudice and to order the court to dismiss the economic duress claim without prejudice. SEI argues that if the district court had decided the RICO questions before reaching the economic duress claim, it would have properly dismissed that case without prejudice for lack of subject matter jurisdiction pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Had that occurred, SEI could then have pursued its economic duress claim in state court, and the state court could have decided for itself whether to recognize the claim.

If SEI had ever suggested this course of action in the district court, we might be inclined to follow it. But despite voluminous briefing in the district court, SEI never asked that court to enter its dismissal of the economic duress claim as without prejudice or solely on jurisdictional grounds. We will not undo the district court's work based on an argument SEI never made in that court. See *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1253 n. 2 (7th Cir.1989) (arguments made for the first time on appeal are waived).

For the reasons set forth above, we affirm the district court's decision to dismiss SEI's economic duress claim, reverse its decision granting summary judgment on SEI's RICO claim, and remand this case to the district court.

AFFIRMED in part, REVERSED in part, and REMANDED.