MILLERS MUTUAL INSURANCE ASSOCIATION OF ILLINOIS, Plaintiff and Counterdefendant-Appellant, v. LOU ANN HOUSE, Defendant and Counterplaintiff-Appellee.

Fifth District   No. 5—96—0030

Opinion filed January 28, 1997.

Kevin J. Babb, of Reed, Armstrong, Gorman, Coffey, Gilbert & Mudge, P.C., of Edwardsville, for appellant.

Robert W. Rongey, of Callis, Papa, Jensen, Jackstadt & Halloran, P.C., of Granite City, for appellee.

JUSTICE HOPKINS delivered the opinion of the court:

Millers Mutual Insurance Association of Illinois (Millers) appeals from orders of the Madison County circuit court in favor of defendant and counterplaintiff, Lou Ann House (House). The issues we consider are: (1) whether Millers made a sufficient offer of uninsured motorist coverage to those covered under its automobile policies; (2) whether the court's order assessing statutory damages and attorney fees against Millers was proper; (3) if statutory damages were proper, whether the amount assessed for those damages and attorney fees was accurate; and (4) whether the court properly entered judgment against Millers for intentional infliction of emotional distress. For reasons we will more fully explain, we affirm the court's order finding that Millers did not sufficiently offer uninsured motorist coverage. We also affirm the order assessing statutory damages and attorney fees against Millers. However, we reverse the court's order against Millers on the issue of intentional infliction of emotional distress.

## I. FACTS

On February 14, 1993, House was injured in a collision with an uninsured motorist. At the time of the accident, she was covered by a policy of automobile liability insurance issued by Millers and providing $100,000 coverage for bodily injury liability and $40,000 coverage for collisions with uninsured and underinsured drivers. On February 10, 1994, House's attorney mailed a letter to Millers offering to settle the case for $100,000, demanding arbitration if Millers did not want to settle, and nominating an arbitrator. Millers did not respond to the settlement offer or to the demand for arbitration, but instead, on April 5, 1994, Millers filed a complaint requesting a judgment declaring that House's uninsured motorist coverage was limited to $40,000.

House filed an answer and counterclaim. Her amended counterclaim alleged that Millers willfully failed to name an arbitrator and, as a result, waived its right to arbitration. House further alleged that Millers' refusal to name an arbitrator and refusal to tender at least $40,000 in settlement of House's uninsured motorist claim amounted to an intentional and willful bad-faith attempt by Millers to delay payment of House's claim.

On August 31, 1995, the cause came on for hearing on Millers' complaint for declaratory judgment and on the count of House's counterclaim seeking reformation of her policy to increase her uninsured motorist coverage to $100,000. Millers presented evidence that it mailed information concerning the rights of its insureds to increase the limits of their uninsured/underinsured motorist coverage to the

amount of liability insurance they carried. According to Jan Scharth, Millers' supervisor for policy services, Millers notified persons such as House of their right to increase their uninsured/underinsured motorist coverage through inserts mailed to the insureds with their renewal notices. Scharth testified that one mail clerk, Carol Korte, was responsible for assembling several pages of inserts and placing all of the inserts into the envelopes containing the renewal notices. During the six-month period in which House received her renewal notice and in which she was supposed to receive the uninsured motorist insert, Korte was required to assemble 200 renewal packages in an average day. Korte was the only person performing this task, and Millers had no way of knowing whether its insureds, such as House, actually received the uninsured motorist insert.

Scharth testified that Millers had a policy that its agents were supposed to check with the insureds they represented to make sure they received their uninsured motorist insert with their renewal packages, but Scharth did not know if House's agent, Warren Baumgartner, followed up with House. Scharth admitted that Millers had absolutely no system to verify that insureds received their uninsured motorist insert, even though it had the capability to do a computer check to verify the receipt of this information during this time period. Scharth also admitted that the information contained in the insert was vague and that insureds could not make an informed decision as to whether they needed to increase their uninsured motorist coverage without calling their insurance agent.

House testified that she had full-coverage insurance through Millers from the age of 16, that she called Baumgartner to drop the policy when she joined the military, and that, after she got out of the military in December 1985, she called Baumgartner to reinstate her full-coverage insurance with Millers in January 1986. House testified that she did not have to come into the office to sign any papers, but that Baumgartner simply took her information over the phone. House stated that Baumgartner never advised her of the existence or nature of uninsured motorist coverage and never informed her that she could increase her uninsured motorist coverage to the same level as her liability coverage. House testified that she was sure that she did not receive the uninsured motorist insert, because if she had, she would have called Baumgartner, since she would not have understood what to do otherwise.

House was working at the time of the car accident and went back to work shortly thereafter. However, she suffered an epileptic seizure at work and was not allowed to return to work thereafter. She received sick pay benefits for a while, but when those benefits were

terminated, she was without any income until she began receiving social security disability payments. The record is undisputed that House suffers from uncontrolled epilepsy as a result of the car accident for which she claimed uninsured motorist benefits. It is also undisputed that the value of her claim exceeds the $100,000 limit for liability and the $5,000 medical payment limit.

After a separate hearing, the trial court entered an order finding that Millers unreasonably delayed payment of the $40,000 uninsured motorist coverage clearly due to House, and as a result, the court assessed statutory damages in the amount of $25,000, attorney fees in the amount of $20,625, prejudgment interest in the amount of $3,800, and taxable costs against Millers. The court also determined that Millers was guilty of intentional infliction of emotional distress by its unreasonable delay in paying at least the $40,000 due to House, and, therefore, the court ordered Millers to pay $50,000 in punitive damages to House.

We will discuss any additional facts necessary to the resolution of this appeal in the following analysis section.

## II. ANALYSIS

### A. NOTICE OF RIGHT TO INCREASE UNINSURED MOTORIST COVERAGE

The trial court held that Millers waived its right to arbitration by filing the declaratory judgment action and that the manner in which the notice was mailed to insureds such as House was not commercially reasonable. As a result of this finding, the trial court ordered reformation of House's insurance policy to provide her with $100,000 in uninsured motorist coverage. The trial court based its decision upon the finding that Millers had no policy to confirm that its insureds actually received the insert. Additionally, the trial judge indicated that he believed House's testimony that, in fact, she did not receive the insert and that she thought she had full-coverage insurance at the time Millers attempted to send her the insert. The court reasoned that it would be inconsistent for House to think that she needed to change her policy to increase her coverage for uninsured motorist insurance since she did not know what uninsured motorist coverage was, and no one, including her insurance agent, ever explained it to her.

Millers argues that its method of placing the uninsured motorist coverage inserts into policyholders' renewal packets is acceptable under the relevant case law and, as such, the court erred in reforming the policy. The leading Illinois Supreme Court decision on this issue is *Cloninger v. National General Insurance Co.*, 109 Ill. 2d 419

(1985). In *Cloninger*, the supreme court determined "what type of information would adequately inform an insured so that the insured could make an intelligent decision." *Cloninger*, 109 Ill. 2d at 425. Those who are covered under automobile insurance policies are entitled to this information because our legislature requires that uninsured and underinsured motorist coverage be offered to policyholders. The statute in effect when House had her insurance reinstated in 1986 and renewed in 1987 stated as follows:

> "No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be renewed or delivered or issued for delivery in this State *** unless uninsured motorist coverage *** is offered in an amount up to the insured's bodily injury liability limits." Ill. Rev. Stat. 1987, ch. 73, par. 755a—2(1).

Our courts have interpreted the statute to require that the insured has the right to make an intelligently informed decision about whether to elect or reject uninsured motorist coverage in an amount equal to the insured's liability coverage. *Cloninger*, 109 Ill. 2d at 425. The trial court in the case at bar determined that the method employed by Millers was not reasonably sufficient to ensure that House, or other insureds in her position, received enough information to make an intelligently informed decision.

■ In order to provide reasonable notice, an insurance company's notice must meet all four of the following requirements:

> "(1) notification must be commercially reasonable if the offer is made in other than face-to-face negotiations; (2) the limits of the optional coverage must be specified and not set forth in general terms; (3) the insured must be intelligibly advised by the insurer of the nature of the option; and (4) the insurer must advise the insured that the optional coverage is available for relatively modest premium increases." *Cloninger*, 109 Ill. 2d at 425-26.

See also *Orr v. Illinois Farmers Insurance Co.*, 210 Ill. App. 3d 1015 (1991).

Millers argues that its method of mailing the offer with renewal notices was commercially reasonable, citing *Cloninger*, 109 Ill. 2d at 428, and *Krska v. Allstate Insurance Co.*, 162 Ill. App. 3d 549 (1987), which both hold, generally, that sending notices of the offer through the mail is a commercially reasonable method of providing this information to the insureds. Both *Cloninger* and *Krska* are distinguishable, however, because neither case considers the procedure for placing renewals in the mail. The issue in the case at bar is whether the procedure Millers used to attempt to notify its insureds by mail was commercially reasonable.

■ Although no Illinois court has defined what constitutes commercial reasonableness in regards to informing insureds about uninsured motorist coverage, in *Orolin v. Hartford Accident & Indemnity Co.*, 585 F. Supp. 97 (N.D. Ill. 1984), the federal court adopted an objective standard of reasonableness. The *Orolin* court found an insurance company's practice of attaching underinsured motorist coverage information to premium renewal notices to be commercially reasonable. However, unlike the present case, in *Orolin* there was no issue of the manner in which those notices were placed in the mail.

Following the objective standard of reasonableness, the court in *Houser v. State Farm Insurance Co.*, 193 Ill. App. 3d 125 (1989), found that the insurance company's computerized system of mailing underinsured and uninsured motorist information with its renewal notices was commercially reasonable, and the court found that the insured failed to present evidence indicating that the offer was made in an unreasonable manner. *Houser*, 193 Ill. App. 3d at 128.

The court in *Pentzien v. Liberty Mutual Fire Insurance Co.*, 269 Ill. App. 3d 436 (1995), held that an offer of uninsured motorist coverage that was made in a mailing separate from the policy renewal and without follow-up was not made in a commercially reasonable manner, which entitled the insured to the reformation of his automobile insurance policy to reflect uninsured motorist coverage in the same amount as his liability coverage.

■ The evidence in the instant case is unlike the evidence in the cases that find that mailing the uninsured motorist information with the renewal notices is a commercially reasonable manner in which to disseminate this information. The evidence before the trial court herein was that Millers relied upon one mailing clerk to hand-assemble envelopes with several inserts, including the uninsured motorist offer, at the typical rate of 200 per day, without any supervision or other system to verify whether any insured ever got the information. This evidence supports the court's finding that, while mailing itself is generally a commercially reasonable method for informing insureds of their rights, the mailing in this case was not done in a commercially reasonable manner.

Additionally, the court found that House's testimony, that she did not receive any information at any time concerning the nature of uninsured motorist coverage or her rights in regard to that coverage, was credible. Although the standard for determining commercial reasonableness is objective rather than subjective, House's testimony is relevant to the question of whether the process of having one person stuff six inserts into an average of 200 renewal envelopes per day is a commercially reasonable method for getting all of the neces-

sary information to the insureds. The evidence was undisputed that Millers was aware that other information inserted into the same renewal packets did not make it to some of the insureds. That evidence, together with House's testimony that she did not receive the uninsured motorist insert, supports the court's finding that the method used by Millers was not commercially reasonable. Based on our review of the record, we find that the court's decision was supported by the manifest weight of the evidence, and accordingly, we affirm the reformation of House's policy to provide her with $100,000 in uninsured motorist coverage.

## B. STATUTORY DAMAGES FOR UNREASONABLE DELAY

There is no question that Millers was entitled to file a declaratory judgment action in order to determine whether the policy provided House with $40,000 coverage, as Millers contended, or $100,000 coverage, as House contended. The trial court found, however, that House's policy clearly provided for arbitration and that there was no bar to arbitrating House's claim, even if Millers' declaratory judgment action was pending. Additionally, the court found that Millers consciously decided to force House into litigating an issue that should have been arbitrated, specifically, what damages House was entitled to receive for her $40,000 uninsured motorist claim.

■ The trial court's authority for assessing statutory damages, attorney fees, and costs against Millers is section 155 of the Illinois Insurance Code (215 ILCS 5/155(1) (West 1992)):

"In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action."

Millers admits in its brief to this court that House "was unquestionably entitled to $40,000 in uninsured motorist coverage under the policy as written." Millers argues, however, that since House

demanded $100,000 to settle the case in her February 1994 letter to Millers, Millers was entitled to file the declaratory judgment action to determine the amount of coverage due to House. House counters that Millers should have either paid the $40,000 owed to House or, at a minimum, Millers should have responded to House's demand for arbitration. Millers admits that if it had responded to House's demand for arbitration, Millers would have paid House $40,000 in liability insurance and $5,000 in medical payments at least seven months before Millers finally paid those amounts to House.

Millers argues, however, that a long line of case law supports its position that the issue of coverage must be decided before a claim proceeds to arbitration, citing *State Farm Fire & Casualty Co. v. Yapejian*, 152 Ill. 2d 533 (1992), *Flood v. Country Mutual Insurance Co.*, 41 Ill. 2d 91 (1968), *Elliott v. Inter-Insurance Exchange of Chicago Motor Club*, 169 Ill. App. 3d 702 (1988), and *Clark v. Country Mutual Insurance Co.*, 131 Ill. App. 3d 633 (1985). Millers contends that an additional case, *Glidden v. Farmers Automobile Insurance Ass'n*, 57 Ill. 2d 330 (1974), is of particular importance because it supports Millers' position that it was not required by law to arbitrate House's uninsured motorist claim before the limits of her coverage were judicially determined. Millers argues that since it was authorized by law to pursue a declaratory judgment action before entering into arbitration, "such conduct cannot be held to constitute bad faith." We disagree with Millers that House was precluded from receiving statutory damages and attorney fees pursuant to section 155 simply because Millers had the legal authority to pursue a declaratory judgment action and House had no authority to require Millers to arbitrate.

The question of coverage that must be determined prior to an arbitration proceeding is not the type of coverage question involved in the instant case. A coverage issue that precludes arbitration is one in which it is disputed that the claimant is entitled to *any* recovery under the policy. See *Yapejian*, 152 Ill. 2d at 542-43 (and cases cited therein). In contrast, Millers admits that there has never been any real dispute over the fact that House's accident was covered under the policy. The only question was whether the limit of her coverage was $40,000 or $100,000.

> "Normally, where the parties to a contract have agreed to resolve disputes through arbitration, a declaratory judgment should not be sought until after the arbitrator's decision has been rendered. [Citation.] After all, one of the purposes of arbitration is to avoid costly and time consuming litigation. However, where the dispute involves a question of law that is outside the authority of

the arbitrator, proper resolution is made by way of declaratory judgment. One example of a question of law outside the authority of the arbitrator is whether there exists an arbitration agreement at all. [Citation.]

Another area of law outside the authority of the arbitrator is 'coverage' disputes arising under insurance policies." *Allstate Insurance Co. v. Elkins*, 63 Ill. App. 3d 62, 64-65 (1978), *aff'd*, 77 Ill. 2d 384 (1979).

■ The question of whether the insurer's action and delay is vexatious and unreasonable is a factual one, and it is a matter for the discretion of the trial court. As a result, the trial court's determination will not be disturbed on review unless an abuse of discretion is demonstrated in the record. *Morris v. Auto-Owners Insurance Co.*, 239 Ill. App. 3d 500, 502-03 (1993). No single factor alone is controlling in determining whether an insurer is guilty of vexatious delay in refusing to settle. Instead, the totality of the circumstances, taken in broad focus, will determine the matter. *Deverman v. Country Mutual Insurance Co.*, 56 Ill. App. 3d 122, 124 (1977). A refusal to settle is not vexatious *per se*. Where there is a *bona fide* dispute about coverage, depending upon the circumstances, delay in settling a claim may not violate the statute. *Morris*, 239 Ill. App. 3d at 503.

■ In the instant case, there is no dispute about House's $40,000 coverage. Millers admits that there was never any question about the coverage of House's uninsured motorist claim up to $40,000 in liability and $5,000 in medical payments. The only dispute was in regards to the amount she claimed in excess of $40,000. House demanded arbitration, but Millers ignored her demand and filed a declaratory judgment action instead. The record is clear that Millers knew that House would have to wait until after the circuit court case was resolved to be paid the $45,000 Millers knew it owed her. We find, based upon our review of the record, that the trial court did not abuse its discretion in finding that, under the circumstances, Millers' delay in paying at least the $40,000 liability and $5,000 medical payments due House was vexatious and unreasonable.

## C. AMOUNT OF PUNITIVE DAMAGES

Millers next argues that even if punitive damages were warranted, the trial court erred in its calculation of those damages. First, Millers argues that, as to statutory damages, $10,000 is the maximum allowable, rather than the $25,000 awarded. Millers contends that the court was required to assess statutory damages under section 155 in the least amount possible under that statute. Millers' argument fails, because the statute does not contain any language to suggest that the court is required to choose damages in the least amount possible.

■ On the contrary, section 155 clearly and unambiguously authorizes the trial court, after a determination of vexatious and unreasonable delay, to assess punitive damages in "an amount *not to exceed any one of the following amounts:*" (a) 25% of the claimant's recovery, (b) $25,000, or (c) the amount in excess of the insurance company's offer of settlement. (Emphasis added.) 215 ILCS 5/155(1) (West 1992). Since the legislature specifically left the choice of the three categories of punitive damages up to the trial court, and since Millers offers no authority to show that House was not entitled to $25,000 in punitive damages, we will not disturb the trial court's assessment of $25,000 in statutory damages.

■ Next, Millers argues that the court erred in assessing $3,800 in prejudgment interest and $20,625 in attorney fees. Millers does not cite any authority for either of these arguments but relies solely upon its version of the facts. However, the trial court's order assessing interest and attorney fees is not against the manifest weight of the evidence. We find that Millers has waived this argument for failure to cite relevant authority. 145 Ill. 2d R. 341(e)(7); *Britt v. Federal Land Bank Ass'n*, 153 Ill. App. 3d 605 (1987). Therefore, we will not disturb the court's award of $3,800 in prejudgment interest or the court's award of $20,625 in attorney fees.

## D. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The trial court entered judgment against Millers on the count of House's amended counterclaim alleging that Millers had intentionally inflicted severe emotional distress upon her. The evidence presented to the court on this issue consists of the following. A few months after the accident, House lost her job and all sources of income except family help and charity donations. Prior to the discovery conducted in the declaratory judgment action, however, Millers knew nothing of House's financial condition, whether she had any income, or if she did, its source or amount. House testified that her epileptic condition was severe and caused her much distress, but that she would have been able to take that in stride if she had not had the added burden of suddenly being totally dependent on others for food, clothing, and shelter. According to House, it was the lack of an income that caused her the most severe emotional trauma.

■ In order to sustain an action for intentional infliction of emotional distress, four elements must be proved:

"First, the conduct must be extreme and outrageous. The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities. 'It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress,

or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency ***.' [Citation.]

[Second,] [t]he emotional distress must be *severe.* *** 'The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.' [Citations.]

Third, reckless conduct which will support a cause of action under the rules stated is conduct from which the actor knows severe emotional distress is certain or substantially certain to result. [Citation.] Liability extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it. [Citation.]

Fourth, *** the extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with another which gives the actor actual or apparent authority over the other or power to affect his interests." (Emphasis in original.) *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 89-90 (1976).

■ Based upon the factors set forth in *Davis*, we find that the trial court's finding in regards to the emotional distress claim is against the manifest weight of the evidence. The only conduct of Millers about which House complains is that Millers failed to pay money due to her in a timely fashion. There was no evidence from which the court could find that Millers knew or should have known that its conduct in delaying payment of the $40,000 to House was substantially certain to cause House emotional distress. Since all four of the elements of the tort must be proved in order to succeed, we reverse the judgment against Millers for intentional infliction of severe emotional distress.

## III. CONCLUSION

For all of the reasons stated, we affirm the trial court's orders in favor of House and against Millers reforming House's insurance policy to provide House with $100,000 in uninsured motorist coverage, we affirm the finding of vexatious and unreasonable delay in paying House's $40,000 claim, and we affirm the court's award of statutory damages in the amount of $25,000, prejudgment interest in the amount of $3,800, and attorney fees in the amount of $20,625,

plus costs. However, we reverse the court's order in favor of House and against Millers for intentional infliction of emotional distress.

Affirmed in part and reversed in part.

WELCH and CHAPMAN, JJ., concur.