Anthony L. CORNISH, Geraldine Cornish, and Laurie A. Cornish, Plaintiffs,

v.

Edward PAPIS, Samuel Hoskins, Patrick Rabe, James Bridges, and Michael Johnson, Defendants.

No. 90–2396.

United States District Court, C.D. Illinois, Springfield Division.

April 30, 1997.

Roxy M. Schumann, Davenport, IA, for Plaintiffs.

Mary W. McDade, Peoria, IL, for Defendants.

## OPINION

RICHARD MILLS, District Judge.

A gas station attendant is attacked and brutally beaten.

The police, without a warrant, arrest a suspect and detain him for four days without bringing him before a judicial officer.

Has the suspect's rights been violated?

Not under these facts.

## I. FACTS

On Monday, October 2, 1989, Scott Bridgmon, while working as an attendant at a Clark gas station in Peoria, Illinois, was at-tacked and savagely beaten. Bridgmon is a white male. However, during the investigation, several witnesses advised the police that when they attempted to purchase gasoline at the station, a black male, whom they believed to have been the attendant, approached them and stated either that the pumps were broken or that the station was closed. The police assumed that the black male whom the witnesses saw was Bridgmon's attacker.

One witness, Richard Sils, described the black male as age 25–29, short hair, a patchy two-day growth of beard, and wearing a blue jacket and pants with a white shirt. Another witness, Theresa Baker, described the black male as 5′ 10″ to 5′ 11″ tall, big build, short hair, small mustache, and wearing dark uniform-type pants with a white shirt. Baker also told police that the black male's shirttail was hanging out of his pants and was splattered with blood. A third witness, George May, described the black male as age 25–30, approximately 6′ 3″ tall, weighing 170 lbs., medium length hair, and wearing dark clothes. May also stated that the black male was definitely not light skinned. Finally, a fourth witness, Cheryl Rynearson, came forward ten days after the attack in response to a "crime stoppers" appeal to the public for information. Rynearson told the police that the black male was clean-cut, 6′ 0″ to 6′ 2″ tall, 180 lbs., and approximately 25 years old.

On Wednesday, October 11, 1989, Officer Hoskins and Sgt. Papis of the Peoria Police Department, on separate occasions, spoke with Anthony Cornish. Both noted that Anthony generally matched the physical descriptions given by the witnesses. The officers also noted that Anthony was wearing dark pants and a white shirt with the shirttail hanging out. Officer Hoskins had prior knowledge of the fact that Anthony and his family lived in close proximity to the Clark gas station. Officer Hoskins also knew that between Anthony's house and the Clark gas station was a construction site where metal forming stakes similar to the one found at the crime scene could be obtained.[1]

---

1. The police believed that the attacker used a metal forming stake to beat Bridgmon. When the police arrived, Bridgmon was unconscious; he had nine skull fractures and a large gash on his cheek. The wall, floor, and door to the restroom were covered with blood. Next to the restroom door, the police found a metal forming stick covered in blood.

Later that same day, Detectives Bridges, Rabe, and Little, and Sgt. Papis went to Anthony's home. Anthony was not there, so the officers spoke to his wife, Geraldine Cornish. At their request, Geraldine gave the officers a color photograph of Anthony. The officers, in turn, gave the photograph to Officer Gary Siebenthal who reproduced the photograph in a cropped black and white format to make its appearance similar to that of other police department photographs. The police then returned the original photograph the next day.

On Thursday, October 12, 1989, Officer Vera Fernandez took the black and white photograph of Anthony Cornish along with 24 other black and white photographs of black males of similar height, weight, and age as that of Anthony Cornish to George May. May selected Anthony's photograph from the array and indicated that Anthony looked like the person he saw at the Clark gas station, but he could not make a positive identification. Later that same day, Cheryl Rynearson came to the Peoria police station and from the photographic array, identified Anthony Cornish as the man she saw at the Clark gas station.

After discussing the evidence and the information which they had, the police determined that they had probable cause to arrest Anthony Cornish. Accordingly, Sgt. Adams and two other officers arrested Anthony when he exited his house. The officers then transported Anthony to the police station where he was interviewed by Detective Rabe. Anthony informed Detective Rabe that he could not have committed the crime at the Clark gas station because he was at home watching Monday night football with his friends at the time. Shortly thereafter, Anthony invoked his Fifth Amendment right to remain silent and refused to continue with the interview.

Shortly after midnight, Anthony appeared in a physical line-up with four black males with physical characteristics generally similar to his. Rynearson and Baker viewed the physical line-up separately. Detective Bridges was present with both witnesses during these viewings. During the physical line-up, both Rynearson and Baker positively identified Anthony Cornish as the black male whom they saw at the Clark gas station on the day of the beating. Thus, the police booked Anthony Cornish on the charges of attempted murder, armed robbery, armed violence, and aggravated battery and transported him to the Peoria County jail. After these events, Anthony had no further contact with the Peoria Police Department.

During the early morning hours of Friday, October 13, 1989, several alibi witnesses arrived at the Peoria police station on behalf of Anthony Cornish. Although the accounts differ as to whether the witnesses were summoned by the police or whether they arrived voluntarily, it is clear that each alibi witness arrived *via* his or her own transportation. No alibi witness was brought to the station by a police officer. Among the alibi witnesses who appeared at the police station was Laurie Cornish, Anthony's sister. The police interviewed Laurie for approximately an hour and a half.

Attorney Thomas Trager also arrived at the police station that night at the request of Loren Cornish, Anthony's father. However, Thomas Trager was not allowed to see Anthony because Anthony had not specifically requested to see him. Anthony did ask to see his father, and the police obliged. Although Thomas Trager did not speak to Anthony, he contacted the Peoria County State's Attorney's Office on Anthony's behalf and reached an agreement whereby Anthony would not be formally charged until he had been given the opportunity to take a polygraph examination. If Anthony passed the examination, the State's Attorney's Office agreed to release him without filing formal charges.

However, the polygraph examination could not occur until Monday, October 16, 1989. While under normal circumstances Anthony would have been taken before a judicial officer at 3:00 p.m. on Friday, October 13, 1989,[2] because it was Attorney Trager's goal

---

2. Friday afternoon at 3:00 p.m. is the routine time for arraignment hearings in Peoria County Circuit Court.

to have Anthony released without the filing of formal charges, Anthony was not brought before a judge for a formal arraignment.

While Laurie Cornish was being interviewed at the police station, Detective Rabe sought and obtained a search warrant for Anthony's house. Detective Rabe never executed the warrant, however, because Geraldine Cornish signed a consent enabling the police to search the premises. While other officers searched the house, Detective Rabe interviewed Geraldine. The officers found no evidence at the house.

On Saturday, October 14, 1989, police officers called the Cornishes and asked the alibi witnesses to come to the police station to be interviewed. After the telephone request, Detectives Johnson and Sier went to the Cornish residence and asked the alibi witnesses to come to the police station. Herman Cornish, Anthony's uncle, told everyone that if they had not done anything wrong, they should go and talk to the police.[3]

Eventually, all of the alibi witnesses arrived at the police station. Detective Rabe interviewed Geraldine Cornish; Detective Johnson interviewed Laurie Cornish. Numerous other witnesses were also interviewed by other officers at that time. During the times that the alibi witnesses were not being interviewed, they were free to eat, drink, smoke, use the restroom, and congregate in an unused office.

During the course of her interview, Anthony's wife, Geraldine, gave a statement implicating her husband in the Clark gas station crime. She stated that Anthony had gone to the station at approximately 6:00 p.m. on Monday, October 2, 1989, to purchase some chips and soda, and that Anthony had argued with the attendant. She also stated that Anthony had returned to the Clark gas station at approximately 9:00 p.m. that night. When he returned home, Anthony had blood on his shirt. Geraldine said that Anthony told her that he had returned to the Clark

gas station and had "whooped his [the attendant's] ass." Geraldine's statement was then reduced to writing, and she signed it. After Geraldine signed the statement, Detective Rabe asked her if she would submit to being fingerprinted for elimination purposes, and she agreed.[4]

After she was fingerprinted, Officer Fernandez advised Geraldine that she could leave. Detective Rabe then confronted Laurie Cornish with Geraldine's statement and asked her if she would also submit to being fingerprinted for elimination purposes, and she agreed.[5]

When Geraldine left the police station, she returned home and went to bed. Later, she was found unresponsive and in a fetal position. An ambulance was called, and she was taken to Methodist Hospital in Peoria, Illinois. Geraldine voluntarily admitted herself into the hospital and remained there under the care of Dr. Colen, a psychiatrist, for approximately one week.

On Sunday, October 15, 1989, attorney Roxy Schumann met with Anthony Cornish at the Peoria County Jail.[6] The next day, Ed Bowers administered a polygraph examination to Anthony. After the examination, Bowers informed the State's Attorney's Office that he was of the opinion that Anthony was being truthful in his denial of any involvement in the Clark gas station crime. Therefore, Anthony was released, and no formal charges were filed against him.

## II. LEGAL STANDARD

■ Federal Rule of Civil Procedure 50(a)(1) clearly establishes the standard by which a district court should decide a motion for judgment as a matter of law:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on

---

3. Herman Cornish is a retired Peoria police officer.

4. However, Geraldine testified at trial that she felt that she had no choice but to permit the police to take her fingerprints.

5. Like Geraldine, Laurie testified at trial that she felt that she had no choice but to permit the police to take her fingerprints.

6. Ms. Schumann is Plaintiffs' counsel of record in this matter.

that issue, the court may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

*See Mayer v. Gary Partners and Co., Ltd.*, 29 F.3d 330, 335 (7th Cir.1994). Thus, the standard for deciding motions for judgment as a matter of law mirrors the standard for deciding a motion for summary judgment. *Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992). "In either case, the district court must enter judgment if, under the governing law, a reasonable fact-finder could not find for the nonmoving party." *Id.; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If a reasonable jury could find for the nonmoving party, judgment as a matter of law is inappropriate. *Shields Enterprises*, 975 F.2d at 1294.

## III. ANALYSIS

In his Third Amended Complaint, Anthony Cornish brings two federal claims and three state claims. Anthony Cornish claims that he was wrongfully arrested and wrongfully detained by Defendants in violation of his federal rights, and he claims that he was falsely arrested and falsely imprisoned by Defendants in violation of his state rights. Finally, Anthony Cornish claims that as a result of these violations he has suffered emotional distress.

Likewise, Geraldine and Laurie Cornish bring both federal and state law claims. Geraldine and Laurie Cornish claim that they were wrongfully detained by Defendants in violation of federal law and were falsely imprisoned in violation of Illinois state law. As a result of these violations, both Geraldine and Laurie Cornish claim that they too have suffered emotional distress.

### A. *Wrongful Arrest & False Arrest*

Anthony Cornish claims that his arrest violated both his federal and state rights. Anthony argues that the police did not have a warrant for his arrest, and furthermore, they lacked probable cause to make an arrest. Thus, Anthony asserts that he was wrongfully arrested in violation of his federal rights and that he was falsely arrested in violation of his state rights.

In order to state a cause of action for a wrongful arrest, a plaintiff must show that the conduct complained of was committed by a person acting under color of state law, that this conduct deprived the plaintiff of rights, privileges, or immunities secured by the U.S. Constitution, and that the defendant's acts were the proximate cause of the injuries and consequent damages sustained by the plaintiff. *Schertz v. Waupaca County*, 875 F.2d 578, 581 (7th Cir.1989). To state a cause of action for a false arrest, a plaintiff must show that he was restrained or arrested by the defendant and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff. *Meerbrey v. Marshall Field and Co., Inc.*, 139 Ill.2d 455, 474, 564 N.E.2d 1222, 1231, 151 Ill.Dec. 560, 569 (1990).

The key issue here is whether Defendants had probable cause to arrest Anthony Cornish. Under the Fourth Amendment to the U.S. Constitution, a police officer may make a warrantless arrest if he has probable cause. "Probable cause exists 'if at the moment the arrest was made … the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the arrestee was committing an offense." *Jones v. Watson*, 106 F.3d 774, 779 (7th Cir.1997), quoting *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991); *see Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir.1996), *cert. denied* — U.S. ——, 117 S.Ct. 952, 136 L.Ed.2d 840. Under Illinois law, an officer may make a warrantless arrest when "[h]e has reasonable grounds to believe that the person is committing or has committed an offense." 725 ILCS 5/107–2(1)(c) (1996); *see People v. Warren*, 173 Ill.2d 348, 357–58, 671 N.E.2d 700, 706, 219 Ill.Dec. 533, 539 (1996).

In the instant case, the Court finds that Defendants had probable cause to arrest An-

thony Cornish in connection with the Clark gas station crime. Anthony Cornish generally matched the physical description given by four separate witnesses of the assailant. Furthermore, two witnesses identified Anthony's picture from a photographic array as the black male whom they saw at the Clark gas station.[7] A third witness also identified Anthony, although he was somewhat unsure that Anthony was the same man. Two witnesses identified Anthony Cornish from a physical line-up as the black male whom they saw at the Clark gas station.[8]

In addition, the police knew that Anthony Cornish lived in the same general area as the Clark gas station and knew that between his house and the Clark gas station was a construction site where metal forming stakes could be obtained. Finally, the police had Geraldine Cornish's statement implicating Anthony in the crime. Clearly, under these facts and circumstances, a prudent man would have probable cause to believe that Anthony Cornish had committed the offense. Because probable cause existed, a motion for judgment as a matter is law is appropriate.[9]

Accordingly, the Court finds that Defendants had probable cause to arrest Anthony Cornish and that Defendants' conduct did not deprive him of any right, privilege, or immunity protected by the U.S. Constitution. Moreover, there was no legally sufficient evidentiary basis presented at trial with which a reasonable jury could find that Anthony Cornish was wrongfully arrested and/or falsely arrested.

**B.** *Wrongful Detention & False Imprisonment*

■ Anthony, Geraldine, and Laurie Cornish each claim that they were wrongfully detained by Defendants in violation of their federal rights and that they were falsely imprisoned by Defendants in violation of their state rights. In order to state a cause of action for a wrongful detention, a plaintiff must prove the same essential elements necessary to maintain a claim of wrongful arrest. *Schertz*, 875 F.2d at 581. Likewise, to state a cause of action for false imprisonment, a plaintiff must prove the same elements necessary to establish a claim of false arrest. *Meerbrey*, 139 Ill.2d at 474, 564 N.E.2d at 1231, 151 Ill.Dec. at 569.

In the present case, Plaintiffs were not falsely imprisoned. As we have already discussed, Defendants had probable cause to arrest Anthony Cornish in connection with the Clark gas station crime. At trial, Anthony failed to establish the second element of his cause of action for false imprisonment, *i.e.* that Defendants acted without having reasonable grounds to believe that an offense was committed by him.

■ On the other hand, Geraldine and Laurie Cornish failed to establish the first element, *i.e.* that they were restrained or arrested by Defendants. " '[A] person has been 'seized' within the meaning of the Fourth Amendment' ... 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The evidence presented at trial showed that Geraldine and Laurie Cornish were not seized within the meaning of the Fourth Amendment.

All of Geraldine's and Laurie's contacts with Defendants were voluntary. Laurie Cornish, as an alibi witness, twice went to the police station (October 12 and 14, 1989).

---

**7.** *See People v. McClinton*, 59 Ill.App.3d 168, 174–75, 375 N.E.2d 1342, 1348, 17 Ill.Dec. 58, 64 (1978) (holding that photographic identification coupled with the officer's knowledge that a crime had been committed provides probable cause for a warrantless arrest).

**8.** *See Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir.1994) (holding probable cause exists based upon information received from a reliable eyewitness)

**9.** "[I]f a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed." *Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir.1993), quoting *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir.1992).

Both times she arrived *via* her own transportation. No officer ever told Laurie that she was under arrest or that she was not free to leave at any time. A reasonable person under Laurie's circumstances would have believed that she could have declined going to the police station and/or speaking with the police.[10] Although Laurie testified that she felt compelled to come to the station and to allow herself to be fingerprinted, Plaintiffs presented no evidence to show that these actions were compelled by Defendants or that she made any objections known to the police.

■ Geraldine also went to the police station on Saturday, October 14, 1989, voluntarily. Her statement incriminating her husband was likewise given of her own free will and volition. Consensual encounters between the police and interviewees do not constitute seizures under the Fourth Amendment. *Kernats v. O'Sullivan,* 35 F.3d 1171, 1177 (7th Cir.1994). The Court cannot say that the time, place, length, or manner of the contacts between Geraldine and Defendants constituted a seizure. *United States v. McCarthur,* 6 F.3d 1270, 1275–76 (7th Cir. 1993); *People v. Maxson,* 285 Ill.App.3d 585, 593–94, 673 N.E.2d 1110, 1116, 220 Ill.Dec. 689, 695 (1996). At all times, Geraldine was free to leave or stop the encounter. Therefore, Geraldine and Laurie Cornish were not falsely arrested by Defendants.

■ Likewise, Plaintiffs were not wrongfully detained. Plaintiffs failed to show that Defendants' conduct deprived them of any right, liberty, or immunity secured by the U.S. Constitution. As we have said, Geraldine and Laurie Cornish were not detained by Defendants. They were free to leave the police station or to terminate their interviews at any time. While Geraldine and Laurie were fingerprinted, their cards stated that they were an "APPLICANT" rather than an "ARREST." The U.S. Constitution does not protect individuals from all contacts with the

police or from being investigated. *Hale v. Townley,* 45 F.3d 914, 920 (5th Cir.1995). Thus, Geraldine and Laurie Cornish were not wrongfully detained.

■ Although Defendants detained Anthony Cornish, his detention was not unlawful. Defendants had probable cause to believe that he was involved in the Clark gas station crime. He was arrested in a public place pursuant to a prompt investigation.

While it is true that Anthony was detained for four days without a determination of probable cause being made by a judicial officer, this delay was attributable, at least in part, to his own actions. Anthony's father, Loren Cornish, retained attorney Thomas Trager to represent Anthony. Attorney Trager testified that it was his intention to have Anthony released without formal charges ever being filed. Accordingly, Mr. Trager reached an agreement with the State's Attorney's Office whereby if Anthony passed a polygraph examination, he would be released.

However, the polygraph examination could not be performed until the following Monday, October 16, 1989. Therefore, the police held Anthony in jail over the weekend. This detention was not to enable the police to locate some incriminating evidence or to build a case against Anthony. *Llaguno v. Mingey,* 763 F.2d 1560, 1568 (7th Cir.1985). Rather, the detention was a result of an agreement made between attorney Thomas Trager and the State's Attorney's Office. Plaintiffs presented no evidence that Defendants detained Anthony out of any ill-will towards him or to prolong his detention. *County of Riverside v. McLaughlin,* 500 U.S. 44, 56–57, 111 S.Ct. 1661, 1669–70, 114 L.Ed.2d 49 (1991).

Accordingly, the Court finds that no legally sufficient evidentiary basis was presented at trial with which a reasonable jury could find for Plaintiffs on their claims of wrongful

---

**10.** *See Rodgers v. Lincoln Towing Serv. Inc.,* 771 F.2d 194, 200 (7th Cir.1985) (holding neither a phone call by the police requesting an arrestee to come to the station for questioning nor the questioning of an arrestee at the station was a seizure within the meaning of the Fourth Amendment); *see also Oregon v. Mathiason,* 429 U.S. 492, 495,

97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977)(holding that where an individual voluntarily goes to the police station to discuss the commission of a crime, that person has not been seized within the meaning of the Fourth Amendment).

detention and false imprisonment. Neither Geraldine nor Laurie Cornish were restrained or arrested by Defendants. Defendants had reasonable grounds to believe that the Clark gas station crime was committed by Anthony Cornish. Finally, Defendants did not deprive Plaintiffs of any right, privilege, or immunity secured by the U.S. Constitution.

### C. *Intentional Infliction of Emotional Distress*

■ Finally, Anthony, Geraldine, and Laurie Cornish claim that as a result of their rights being violated by Defendants, they each have suffered emotional distress. In order to state a cause of action for intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct was extreme and outrageous, that plaintiff's emotional distress was severe, that the defendant acted recklessly (*i.e.* conduct from which the defendant knew severe emotional distress is certain or substantially certain to result), and that the defendant's extreme and outrageous conduct arose from an abuse of a position or a relation with another which gives the defendant actual or apparent authority over the plaintiff or the power to affect the plaintiff's interests. *Millers Mut. Ins. Ass'n of Illinois v. House*, 286 Ill.App.3d 378, 387–89, 675 N.E.2d 1037, 1044–45, 221 Ill.Dec. 613, 620–21 (1997); *McGrath v. Fahey*, 126 Ill.2d 78, 82, 533 N.E.2d 806, 809, 127 Ill.Dec. 724, 727 (1988); *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89–90, 360 N.E.2d 765, 767, 4 Ill. Dec. 652, 654 (1976).

■ In the case at bar, Plaintiffs have not shown that they suffered the intentional infliction of emotional distress at the hands of Defendants. Although Defendants questioned Geraldine and Laurie Cornish, Defendants did not deprive them of food, drink, or treat them harshly in any manner. Even though Anthony Cornish was detained, he was not subjected to extreme and outrageous conduct by Defendants. Defendants had probable cause to arrest Anthony, and they did not detain him any longer than necessary under the circumstances.

The Illinois Supreme Court has stated:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.

*Davis*, 66 Ill.2d at 89–90, 360 N.E.2d at 767, 4 Ill.Dec. at 654, quoting Restatement (Second) of Torts § 46, comment d (1965). Plaintiffs have not shown that Defendants' conduct rose to such a level.

Accordingly, the Court finds that there was no legally sufficient evidentiary basis presented at trial with which a reasonable jury could find that Defendants' conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency in a civilized society." *McGrath*, 126 Ill.2d at 82, 533 N.E.2d at 809, 127 Ill.Dec. at 727.

## IV. CONCLUSION

*Ergo*, pursuant to Federal Rule of Civil Procedure 50, Defendants' Motion for Judgment as a Matter of Law is ALLOWED. Judgment is hereby entered in favor of all Defendants and against all Plaintiffs on each Count in Plaintiffs' Third Amended Complaint.

CASE CLOSED.