In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-1351 & 02-1999

ELMER SANGLAP,

*Plaintiff-Appellant/*
*Cross-Appellee,*

*v.*

LASALLE BANK, FSB,

*Defendant-Appellee/*
*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 1663—**John W. Darrah**, *Judge.*

ARGUED FEBRUARY 11, 2003—DECIDED SEPTEMBER 30, 2003

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Elmer Sanglap had a series of epileptic seizures in the lobby of a LaSalle Bank branch, which prompted the bank to close his savings account. In these consolidated appeals we must decide (1) whether the district court properly granted judgment as a matter of law on Sanglap's claim that by closing his account LaSalle intentionally caused him emotional distress, and (2) whether the court should have granted LaSalle's request for attorneys' fees. Because LaSalle did not intentionally or knowingly disregard a serious risk to Sanglap's

emotional health and because his claim is largely circum-scribed by Illinois human rights legislation, we agree that LaSalle was entitled to prevail on Sanglap's tort claim. We also conclude that the court properly declined to award attorneys' fees and thus affirm in both appeals.

## I. BACKGROUND

In addition to epilepsy, Sanglap suffers from depression and schizoid personality disorder. He lives in Skokie, Illinois, with his twin brother and, by his own admission, has a "limited social life." Until 1998, his activities con-sisted largely of working at a local shoe store and bank-ing at LaSalle's Old Orchard branch across the street. Entries in Sanglap's passbook reflect that he visited the bank frequently. From 1996 to 1998 he was in the Old Orchard branch over 200 times, an average of twice a week.

In 1998, Sanglap had his first of several epileptic sei-zures at the bank. One day in January, while filling out papers at a counter in the lobby, he loudly called out, "Help me, please, help me." Bank personnel rushed over, offered a glass of water, and asked if he was all right. After two or three minutes, during which Sanglap remained stand-ing, he replied that he was fine, walked up to a teller, made a transaction, and left. Sanglap had a similar seizure in the lobby a few weeks later, followed by a third episode on February 27 that was far more severe than the first two. This time Sanglap collapsed (before he had always remained standing) and began moaning and crying for help. Dennis Cloud, the branch manager, called 911, and an emergency team came and attended to Sanglap for about twenty minutes before taking him to the hospital by ambulance.

Despite having an unwritten policy not to terminate accounts because of a customer's medical condition, LaSalle ended its relationship with Sanglap on March 20 when

he had a fourth seizure in the Old Orchard branch. Ten to fifteen minutes after the seizure occurred, Cloud approached Sanglap, who appeared to have recovered and was in line to see a teller, and told him that the bank was closing his account. A teller issued a check to Sanglap, and Cloud allegedly escorted him out to the parking lot. Sanglap testified that although he was still dazed on his way out, he heard a voice, which sounded just like Cloud, tell him that LaSalle did not need his business and that he "could go to another bank."

Sanglap's brother, Roland, met with Cloud the following Monday and asked why the account had been closed and whether Cloud knew that his brother had epilepsy. He also demanded to know why paramedics were not summoned after his brother's most recent episode. According to Cloud, he told Roland that he was totally unaware of his brother's condition and then apologized and offered to reopen the account. Cloud also testified that he had no medical training and that to his knowledge he had never seen someone suffer a seizure.

Roland described this encounter differently. He testified that Cloud became defensive when he described his brother's condition and did not discuss reopening the account. According to Roland, Cloud said that he had closed the account because the seizures were disturbing the bank's customers and made no apologies for his conduct. Cloud then allegedly offered to explain the situation to Roland's brother and walked off.

Sanglap recalled that a few weeks later he received a letter from LaSalle offering him $1000 to reopen his account. Insulted, he ignored the offer (which LaSalle denies having made) and nearly two years later brought this suit. The complaint alleges, among other things, that by closing Sanglap's account LaSalle intentionally caused him emotional distress in violation of Illinois law and

discriminated against him because of a disability in violation of the Americans with Disabilities Act ("ADA"). *See* 42 U.S.C. §§ 12181-12189. A jury awarded Sanglap $80,000 after a trial on his state law claim, and the district court held a bench trial on the ADA claim (on which Sanglap sought only equitable relief), which ended in a verdict for LaSalle. The court then granted LaSalle's renewed motion for judgment as a matter of law on Sanglap's state law claim and denied the bank's request for attorneys' fees, precipitating these appeals.

## II.  ANALYSIS

### A.  Intentional Infliction of Emotional Distress

Sanglap on appeal contests only the judgment as a matter of law on his claim for intentional infliction of emotional distress. To prevail on this claim, Sanglap needed to show (1) that reasonable people would consider closing his account to be "extreme and outrageous"; (2) that LaSalle intended to cause him severe emotional distress or knew to a high degree of probability that closing the account would cause severe distress; and (3) that he in fact suffered severe emotional distress. *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994); *see also Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003). The district court concluded that a reasonable jury could not have found for Sanglap on any of these elements, and we review that ruling de novo, taking the facts in the light most favorable to Sanglap. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-51 (2000).

With respect to the first element, LaSalle contends that its conduct was neither extreme nor outrageous because it closed Sanglap's account peaceably and for legitimate reasons. LaSalle emphasizes that bank employees did not touch Sanglap, raise their voices, or make threats—

all actions that reasonable people might view as extreme responses to the situation. *See Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 768 (Ill. 1976). LaSalle also points out that Sanglap's seizures distracted the bank's tellers and other personnel, providing at least some justification for closing the account. *See McGrath v. Fahey*, 533 N.E.2d 806, 810-11 (Ill. 1988) (defendants who reasonably believe that they are acting for legitimate reasons are less likely to have acted outrageously); *see also Johnson v. Fed. Reserve Bank of Chicago*, 557 N.E.2d 328, 331 (Ill. App. Ct. 1990).

We are not sure that these points alone entitle LaSalle to prevail. Although conduct is outrageous only when it is so atrocious as to transcend "all possible bounds of decency," *Pub. Fin. Corp.*, 360 N.E.2d at 767 (quoting Restatement (Second) of Torts § 46 cmt. d), Illinois courts recognize that context affects the inquiry. Here, for example, LaSalle apparently had control over Sanglap's entire savings—an asset of understandable importance to him. *See Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211-12 (Ill. 1992) (otherwise unobjectionable behavior may be outrageous where the defendant has the power to affect the plaintiff's interests). And Cloud plainly closed the account in response to Sanglap's spells, which a jury might treat as a fairly callous way to handle the serious medical condition of a longtime customer.

But we can put these considerations to one side because Sanglap's claim fails for other reasons. First, Sanglap presented no evidence that LaSalle intended to cause him severe emotional distress or knew that such distress was likely to result from closing the account. Proof of this element can take two forms: The defendant's actions "by their very nature" may be likely to cause severe distress, or the defendant may know that the plaintiff is particularly susceptible to distress and that its conduct thus is likely to cause emotional harm. *Honaker*

*v. Smith*, 256 F.3d 477, 494 (7th Cir. 2001) (burning down the plaintiff's home poses an obvious risk of emotional distress).

Sanglap does not argue that closing a savings account without more is likely to cause emotional distress. Nor does he contend that anyone told LaSalle's employees that he was particularly susceptible to emotional distress. *See Johnson*, 557 N.E.2d at 330 (supervisors told not to place "undue stress" on the plaintiff); *Parker v. Bank of Marion*, 695 N.E.2d 1370, 1373 (Ill. App. Ct. 1998) (defendant aware that the plaintiff "valued his reputation highly"). He instead observes that LaSalle must have known that he had a serious medical condition because he suffered four seizures in the bank's lobby—one of which knocked him to the ground and necessitated medical intervention. From that information, Sanglap reasons, LaSalle could have inferred that emotional distress would likely result from closing his account. *See Pavilon v. Kaferly*, 561 N.E.2d 1245, 1252 (Ill. App. Ct. 1990); *Wall v. Pecaro*, 561 N.E.2d 1084, 1088 (Ill. App. Ct. 1990).

Sanglap's argument erroneously assumes that having a medical condition of any sort implies susceptibility to emotional distress. Not everyone who is sick is also prone to psychic injury. And even if LaSalle should have inferred from Sanglap's erratic behavior that he had epilepsy, he points to no evidence that this particular condition carries a heightened risk of emotional injury. We might have a different case if LaSalle's employees possessed medical training or if they had known that Sanglap was depressed or had another condition linked to emotional fragility. But without such evidence a reasonable jury could not conclude that LaSalle knew to a high degree of probability that its conduct would cause serious injury to Sanglap's emotional well-being. *See, e.g.*, *Millers Mut. Ins. Ass'n v. House*, 675 N.E.2d 1037, 1045 (Ill. App. Ct. 1997).

A deeper defect in Sanglap's case, which the parties oddly have ignored, arises because of the Illinois Human Rights Act. *See* 775 ILL. COMP. STAT. 5/1-101 to 5/10-103. Under that statute intentional torts that are "inextricably linked" to civil rights violations must be adjudicated before the Illinois Human Rights Commission, *see Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997); *Geise v. Phoenix Co. of Chi., Inc.*, 639 N.E.2d 1273, 1277 (Ill. 1994), with only deferential review of the agency's ruling in court, 775 ILL. COMP. STAT. 5/7-101.1(A), 5/8-111; *Raintree Health Care Ctr. v. Ill. Human Rights Comm'n*, 672 N.E.2d 1136, 1141 (Ill. 1996). We held in *Krocka v. City of Chi.*, 203 F.3d 507 (7th Cir. 2000), that the Commission is the proper forum for claims of intentional infliction of emotional distress where the distressing incidents reflect disability discrimination in the workplace. *Id.* at 516-17; *see also Brewer v. Bd. of Trustees*, 791 N.E.2d 657, 664 (Ill. App. Ct. 2003). The statute also prohibits disability discrimination in services furnished by banks and other financial institutions, 775 ILL. COMP. STAT. 5/1-103(Q), 5/4-101(B), 5/4-102(A), which means that Sanglap needed to proceed administratively to the extent that his tort claim is tied to LaSalle's obligations under the statute.

It is true that this allocation of subject matter jurisdiction does not block Sanglap's claim entirely. Disability discrimination and intentional infliction of emotional distress are different wrongs, *see Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 571 (7th Cir. 1997), so Sanglap was authorized to begin in court to the extent that his tort claim does not depend on a civil rights violation. But eliminating the civil rights component takes the air out of the case. What is arguably outlandish here is the suggestion that Cloud, who had never before ordered anyone's account closed, had a "prejudice against customers with medical conditions" and thus closed Sanglap's account to keep him out of the bank. Sanitized of the allegation

that LaSalle treated him differently because of a disability, Sanglap is left to argue that closing a bank account for *any* reason will support a claim for intentional infliction of emotional distress—a position that we are confident the Supreme Court of Illinois would reject.

### B.  Attorneys' Fees

In its cross-appeal, LaSalle argues that the district court committed an abuse of discretion by denying its request for attorneys' fees incurred defending against Sanglap's ADA claim. Fee shifting under the ADA, like other civil rights statutes, is asymmetric: Fees should be awarded to prevailing plaintiffs as a matter of course, but prevailing defendants should recover only when forced to litigate claims that are frivolous, unreasonable, or pursued in bad faith. *Adkins v. Briggs & Stratton Corp.*, 159 F.3d 306, 307 (7th Cir. 1998); *see also Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978); *Maynard v. Nygren*, 332 F.3d 462, 471 (7th Cir. 2003). LaSalle insists that Sanglap's ADA claim meets that standard because he pressed the claim when it was clear that the bank had not learned of his epilepsy until after it closed the account. Because disability discrimination cannot occur if the plaintiff's alleged disability is unknown, *Adkins*, 159 F.3d at 307; *see also Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996), LaSalle believes that Sanglap needed to drop his ADA claim well before trial.

The problem with this argument is that liability for disability discrimination does not require professional understanding of the plaintiff's condition. It is enough to show that the defendant knew of symptoms raising an inference that the plaintiff was disabled. *See Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995); *see also Burns v. City of Columbus*, 91 F.3d 836, 843-44 (6th Cir. 1996). As we explained in *Hedberg v. Ind. Bell Tel. Co.*, 47

F.3d 928 (7th Cir. 1995), most people who observe some-
one suffer frequent seizures will assume that a disability
of some sort is to blame. *Id.* at 934. Likewise, although
LaSalle could not have been expected to know that Sang-
lap was particularly susceptible to severe emotional dis-
tress, bank employees did observe his seizures and could
have inferred from their observations that he had epilepsy
or another disabling condition. Sanglap's pursuit of his
ADA claim therefore was not unreasonable, so the dis-
trict court acted well within its discretion in denying
the request for fees.

## III.  CONCLUSION

The rulings on liability and fees are AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*